---

THE IOLA.

(District Court, S. D. Georgia, E. D. September 22, 1911.)

1. SHIPPING (§ 56*)—CHARTER PARTY—CONSTRUCTION.

Where a charter party hiring a small tug and barges for inland harbor improvement work provided that the property was hired to be used by an engineering company for engineering and construction work in

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the harbors of M. and B., and such other places on the Atlantic or Gulf Coast as the charter party might desire, contained no stipulation for deep sea towage, and did not authorize an assignment to another for any purpose, the charterer had no authority to let the tug to another to tow a loaded car float from Norfolk to Savannah.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 56.*]

2. MARITIME LIENS (§ 65*)—HARBOR IMPROVEMENT WORK—COAL FURNISHED TO TUG AND IMPROVEMENT BARGES.

Coal furnished by libelant for a tug and barges chartered by an engineering company to perform certain harbor improvement work *held* to have been furnished on the credit of the engineering company, and not of the tug, so that the latter was not subject to a libel therefor.

[Ed. Note.—For other cases, see Maritime Liens, Dec. Dig. § 65.*]

3. MARITIME LIENS (§ 25*)—SUPPLIES.

Supplies furnished to a tug on the captain's orders while in a harbor and at her legitimate work under a charter party, the terms of which were not known either to the captain or the merchants, were furnished on the credit of the tug for which it was liable, as provided by Act June 23, 1910, c. 373, 36 Stat. 604.

[Ed. Note.—For other cases, see Maritime Liens, Dec. Dig. § 25.*]

In Admiralty. Libel against the steam tug Iola. Dismissed in part.

Lawton & Cunningham, for libelant.

John Rourke, Jr., and Garrard & Gazan, for claimant.

SPEER, District Judge. The substantial controversy which must be determined may be seen from the statement following:

The Blackstaff Engineering Company, a corporation with its principal office in Philadelphia, made a contract with the government for the construction of jetties in the St. Johns river near Mayport and Jacksonville, Fla., and near Brunswick, Ga. In this work the Blackstaff Company required a tug and a flotilla of barges and water carrying vessels. It secured by contract, or charter party, made with the owners of the tug Iola, four barges and two water carrying vessels. The owners were of Mobile, Ala., and were represented by Lee Kimball, their agent. The libelant, the Standard Fuel Supply Company, a Georgia corporation with its principal place of business at Savannah, furnished a quantity of coal upon contract with the Blackstaff Company for the use of the tug Iola, and made certain advances for food, provisions, repairs, and other supplies. The coal bill amounted to $521.41, advances for food, repairs, and other supplies to $123.71; and at the request of the Blackstaff Company the libelants paid in cash certain drafts of Kay & Doggett, attorneys of Jacksonville, Fla. These were made for the purpose of paying the amount claimed on a libel against the Iola, and certain expenses and attorney's fees connected with that libel. This sum amounted to $285.87. The total amount claimed by libelant is $1,113.54.

The greater portion of the evidence is documentary, and, as there was little ambiguity about this, the cause might have been determined upon construction of this evidence, but for the very copious and valuable briefs of the respective proctors, and the immovable opposition

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of these gentlemen upon every remaining question involved. It was therefore deemed proper to take the case under advisement.

[1] A prime consideration is the construction of the charter party. This is in evidence, and was dated July 26, 1909. It is material to perceive that the charterer, namely, the Blackstaff Company, agrees that it will not suffer any liens to attach to the property thus leased; that it will not permit any indebtedness whatever that might constitute a lien on the property to run or accrue against it, except those indebtednesses which are incurred incident to the ordinary expense of the operation of said floating property; that such operating expenses shall be settled promptly at the end of each month, and a statement thereof furnished to the lessor; that said floating property is hired by the Blackstaff Engineering Company to be used by it in the engineering and construction work in the harbors of Mayport and Brunswick, and such other places on the Atlantic or Gulf Coast as said company might desire; that the property is to be returned to the lessor on August 2, 1910, at Mobile, Ala., in the same good order and condition as when turned over to the charterer, reasonable wear and tear excepted. The charterer, the Blackstaff Company, gave bond in the sum of $25, with the Fidelity & Deposit Company of Maryland as surety, for the faithful performance of this contract. The bond is also in evidence. It is most material to bear in mind that the tug, which was new and of moderate power, was chartered for construction, engineering, and harbor work in inland waters. It contains no stipulation for deep sea towage, and none for assignment to another for any purpose. This conclusively appears from the second clause of section 6 of the charter party:

"It is expressly understood and agreed, however, that it is within the contemplation of the parties hereto that said floating property is hired by said second party to be used by it in the engineering and construction work in the harbors at Mayport and Brunswick, and such other places on the Atlantic or Gulf Coast as the second party may desire."

It is to be observed that, so far as they might do, the owners sought by the charter party to protect themselves from misadventure, failure of contract, or other failure on the part of the Blackstaff Company. It seems clear that there was no privity between the owners of the Iola and the libelants, the Standard Fuel Supply Company. It seems equally clear that the libelants made all of its contracts in the main not with the Iola, but with the Blackstaff Engineering Company. The first material communication on the subject shows this to be true, and also clearly indicates a distinct knowledge on the part of the libelants of the character of the work in which the tug was engaged. This letter is dated June 5, 1909, and is addressed to the Blackstaff Engineering Company, 1332 Walnut street, Philadelphia, Pa. It is evident that the supply company did not have the Iola in mind, for this was more than six weeks before the Blackstaff Company had chartered the Iola. The letter is as follows:

"Gentlemen: We understand you have recently secured a contract for concrete work, and, as we are in a position to furnish you the necessary material at a very attractive figure, we will appreciate your calling on us for prices,

advising approximately how much gravel and sand you may need, and point of delivery.

"Thanking you in advance for an inquiry,

"Very truly yours,                    Standard Fuel Supply Co."

On June 9, 1909, the Blackstaff Company replies from Philadelphia as follows:

"Gentlemen: Replying to your communication of June 5th, we have to state that the contract to which you refer does not include any concrete work, and we do not, therefore, expect to be in the market for sand and gravel."

On June 14th libelant wrote again from Savannah to the Blackstaff Engineering Company at Philadelphia:

"Gentlemen: We have your favor of the 9th instant, and in reply beg to state that we are operating a coal yard at Mayport, Fla., just alongside of where you will be doing your jetty work, and we will be glad indeed if you will let us furnish you with what steam coal you may need for this work. We have a regular agent at Mayport, and if we can be of any service to you while you are doing this work, we will be glad to have you communicate with us."

To this letter Blackstaff replies on June 19th, informing the supply company that their representative expects to be in Jacksonville within a few days, and will call to see them. All of this was anterior to the charter party, and to the appearance of the Iola in the Florida and Georgia waters.

The next letter in evidence is from the Jacksonville office of the Blackstaff Company, and is addressed to libelant at Savannah. It is dated October 23d, and reads:

"On September 13th our tug Iola took from your dock at Jacksonville 28400 # of steam coal trimmed in bunkers, and your Mr. Jewett advised that the price would be $3.75 per net ton. Up to the present writing we have never received a bill for this coal, although we have spoken to Mr. Jewett several times concerning same. Please mail bill to the Jacksonville office as soon as possible, and also advise what rate per ton you will charge for coal if taken at Mayport by our tug and derrick barges. Your prompt reply will be appreciated."

To this letter libelant replied as follows on October 25th:

"Gentlemen: We have your favor of the 23rd instant, and in reply to same beg to hand you herewith invoice for coal delivered to you September 13th at Jacksonville. Whenever you want invoices, or don't get invoices, or want any information about the business, simply drop us a. line to this office. Our agents have instructions to pay no attention whatsoever to anything concerning the home office. We will be pleased to furnish you whatever coal you may desire at Mayport at $4.15 per net ton f. o. b. your derrick, barge, or tug. This proposition is made with the understanding that you are to take your entire supply that you will require at Mayport from us, either at Mayport or Jacksonville.

"Thanking you for this business, we remain,

"Very truly yours,                    Standard Fuel Supply Co."

Now, it seems very clear from this evidence that in the effort to get this "business" the libelants extended no credit whatever upon any maritime lien against the Iola. The contract was made and the coal delivered on the credit of the Blackstaff Company. The agreement was to furnish coal, not only to the Iola, but to the derricks and barges.

From this time until July, 1910, libelant furnished coal regularly to the Blackstaff Company. A number of letters are in evidence, written by Blackstaff and the Standard Fuel Supply Company, relative to the payment of the monthly accounts for coal, and to disputes as to the price. A great number of bills in favor of libelant were rendered, and all made against the Blackstaff Engineering Company. It is true that on some of these statements the words "Tug Iola" are written. This, however, was evidently to indicate where the coal was delivered. The canceled checks and vouchers in evidence show the payment of these bills by the Blackstaff Engineering Company, and up to this time nothing whatever is paid by the Iola. It is also clearly inferable from the testimony of the master that he at no time purchased coal on account of the tug. He would receive orders from the engineering company to repair to the coal docks of the supply company, and take on the needed coal. But this was on account of the Blackstaff Company, and not on account of the tug.

It gradually appears that the Blackstaff Company was not fortunate with its ventures, and failed to pay libelants for the coal furnished during the months of May and June, 1910. This amounted to $379.80, and appears from the bill of particulars attached to the libel. The supply company now began to cast about in an effort to recoup this loss. It was fully apprised by this time as to the work for which the Iola was chartered, namely, in engineering work and construction of jetties at the points named in Florida and Georgia. It is true that the Iola might go elsewhere, but the most casual inquiry would have disclosed that its owner had chartered it for engineering and construction work only. The Iola was a comparatively small tug. The supply company, however, deemed it advisable to utilize such powers as the Iola possessed in a serious work not connected with the government service to which the charter related. It appears that this was taken up first by an indefinite letter, and then by personal interviews or by conversations over the telephone. The letter is as follows:

"Savannah, Ga. July 19, 1910.

"Blackstaff Engineering Co., Mr. W. Stevens Harding, Jacksonville, Fla.

"Gentlemen: Since speaking to you this morning, something has transpired which I believe will enable me to have the 'Iola' do the towing of our barge 'Canton', and we will let you know something definite to-morrow.

"Very truly yours,          Standard Fuel Supply Co."

What it is that "transpired" is not disclosed, but its effect upon Mr. W. Stevens Harding, the representative of the Blackstaff Company, is indicated by his reply of the 21st:

"Gentlemen: Your favor of the 19th inst., just received on first mail this morning. The writer is holding the 'Iola' subject to your order, and am very glad to be of service to you, and at the same time make settlement with you, our Home Company apparently has no regard for agreements and I am anxious to show my loyalty to you as well as to my company.

"Awaiting your earliest instructions.

"Very truly yours,          W. Stevens Harding."

There may be some dubiety with the uninformed in interpreting the word "loyalty" as used in this connection. It is made plain, however, by the next letter that it imports "righteousness." This letter also suf-

ficiently expresses the result of the negotiations between the defaulting Blackstaff Company and the Standard Fuel Supply Company as to the fate of the Iola. It is written at Savannah, July 22, 1910, and is addressed to the "Blackstaff Engineering Co., Mr. W. Stevens Harding, Mgr., Jacksonville, Fla.":

"Gentlemen: We have your favor of the 21st inst., contents noted with care, and we more than appreciate the exact position that you at present occupy, and we think your views are precisely in order, and we never fail to recognize a high standard of righteousness."

After these lofty sentiments, the supply company continues:

"We now beg to confirm phone conversation with you this morning wherein we agreed to give you the towing of our car float 'Canton' at price arranged a few days ago, ($825.00), and we agreed to furnish a new hawser for this job, and this new hawser will be delivered to the tug Iola at Norfolk. It is understood that we are to pay you $825, on delivery of this car float at Savannah, and at the same time you are to pay us the amount of the Blackstaff Engineering Co.'s indebtedness to us. It is understood that you will have the tug Iola coal this afternoon, and we have instructed our agent to coal you up. In case your tug requires any coal at Norfolk we will be pleased to furnish you same, and you can instruct your captain to call on the Maryland Coal & Coke Co., Warricks Hotel Annex at Newport News, and you will be furnished whatever coal your tug requires at the regular market price.

"We are sending this letter to you by special delivery mail, and ask that you acknowledge receipt of same and confirm contents by return mail, mailing your letter to us to-night so that it will leave on the train leaving your city this evening, and we ask that you be kind enough to put a special delivery stamp on same, so that it will reach us early to-morrow morning.

"It is understood that you will not be required to furnish any bond, as we have succeeded in covering the insurance on this barge, to be towed by tug Iola.

"Very truly yours,                Standard Fuel Supply Co.

"It is understood if you fail to deliver our barge at Savannah we are not to be called upon for any compensation."

The surprising expedition, noted by the special delivery letter et cetera, is not without its significance; but it does not appear that the owners of the Iola were apprised of this important and onerous change in the voyage or ventures of the little tug. It is now plain that the values and powers of the Iola were to be used, not in the construction and engineering work for which it was chartered, but were to be utilized to pay a debt of the Blackstaff Engineering Company to the Standard Fuel Supply Company. This was clearly dehors the contract between the Iola and the Blackstaff people. Their contract charged the Blackstaff Company with knowledge of this unwarrantable use. Not less clearly did the supply company know that the proposed towage of the huge car float from Norfolk to Savannah was unwarrantable and an unauthorized use of the tug. Neither, however, hesitated on this account. Replying to Salas, president, on the same days as the last letter, the Blackstaff Company writes:

"Dear Sir: In answer to your esteemed favor of even date, I beg to say that the tug Iola will leave here about ten o'clock to-night, and will go right to Savannah, where Capt. Pinner will report to you for instructions.

"It is understood that the tug Iola is to tow a car float 'Canton' from Norfolk, Va., to Savannah, Ga., for $825.00, you to furnish a new hawser, sufficiently large to hold the barge and tow her safely.

189 F.—62

"Your claim against Blackstaff Engineering Company is to be settled out of this tow money.

"The amount advanced by Mr. W. E. Kay to-day the writer will acknowledge just as soon as he ascertains the exact amount.

"Thanking you most kindly for the courtesies and confidence you have placed in me.

"Very truly yours,      Blackstaff Eng. Co., Jacksonville Office,
                        "Per W. Stevens Harding, Local Manager."

It otherwise appears from the evidence that in order to enable the Iola to proceed northward upon this voyage, to which we will presently advert, it became necessary to pay off a certain libel by which the tug had been seized in Jacksonville. Mr. Salas, president of the libelant company, in his direct testimony, on page 35, states that the tug Iola was tied up in Jacksonville, and could not go on the trip to Norfolk: that she had been chartered to him to take, and that she was tied up on the Barker & Cardy libel, "so the agent of the Blackstaff people, Mr. Harding, asked that the libel be dissolved so that the vessel could be free," and consequently he paid the amount. Mr. Harding, the agent of the Blackstaff Company, states that he had no money to pay off the Barker & Cardy libel. Here Messrs. Kay & Doggett generously appear. Of this sum $50 was paid to Mr. Kay for his professional services in this behalf exerted. It further appears from the testimony of Mr. Salas that after remunerating Messrs. Kay & Doggett $73.50 from the proceeds of their sight draft was for money to pay laborers at Mayport. This does not appear to be an expense incurred by the tug for which the owners are responsible. It further appears that of the remainder $20 was for provisions. This moderate amount was to victual the tug on her voyage from Jacksonville via Savannah to Norfolk. It does not appear that Capt. Pinner, the master of the Iola, was considered or consulted in the supplies stored or brought aboard for the voyage. The money was not paid to him. President Salas testifies as follows:

"Q. Now, Mr. Salas, you say that $20 was for provisions on the trip to Norfolk? A. Yes, sir.

"Q. And who was the money advanced to? A. W. Stevens Harding.

"Q. Who was W. Stevens Harding? A. He was manager of the Blackstaff Engineering Company and the tug Iola."

That he may make it indubitable that he was in no sense responsible for Pinner, Mr. Salas further testifies:

"Q. What did you have to do with Capt. Pinner of the tug Iola? A. I had nothing to do with him. He was sent to Savannah with his tug to proceed to Norfolk for the barge Canton, and I told him to report there to Mr. Duggan, who would deliver the barge to him."

It follows that, if Mr. Salas had nothing to do with Capt. Pinner, Capt. Pinner and the tug Iola, which he commanded, had nothing to do with Mr. Salas. This is confirmatory of what has been previously stated that the entire transaction was between the Blackstaff Company and the Standard Fuel Supply Company.

[2] It also follows that the owners of the Iola are in no sense responsible for any costs of this voyage. The charterer of the tug and

its suppositious creditor had as little right to dispatch Capt. Pinner to Norfolk after the car float Canton as to send him to the South Seas for the buried doubloons and pieces of eight on the Treasure Island of Stevenson, or after the golden fleece coveted by the Argonauts of old. It follows that whatever indebtedness may exist inter sese between the Blackstaff Company and the supply company, or others aiding them in this expedition of the Iola, so clearly beyond the charter party, a court of admiralty will neither subject the vessel therefor, nor, indeed, hear or give any relief to the parties who were thus taking unwarrantable advantage of the Iola's owners, and subject their vessel in a manner not to be justified to settle a debt for which the owner was in no sense liable, and the vessel itself to the gravest danger.

From the testimony of Capt. Avery, for the libelant, it appears that the Iola was about 80 feet in length, 21 feet beam, and 8 or 9 feet depth of hold. Her engines would have developed about 250 horse power. He thinks she was about 70 tons. He saw the car float Canton. The car float was 335 feet long, over all, about 40-feet beam, 12 to 14 feet depth of hold, and she was about 1,200 tons register. It was quite proper, therefore, with a tow so large, and with a tug of such small capacity, that the agent of the insurance company, coming aboard at Norfolk, positively refused to permit this scheme between the Blackstaff Company and the libelants to be carried out. Capt. Avery himself testifies that the tug could have been brought from Norfolk around Cape Hatteras under the most favorable conditions only, when perfectly smooth and calm, with no headwinds. He adds:

"I would not have thought of sending that kind of a vessel on that trip. If I was the owner of the barge, I wouldn't let the tug take her, and, if I was the owner of the tug, I wouldn't send her."

He also testified that at the time of the proposed towage it was the very worst part of the year, the hurricane season. To the same effect is the testimony of another experienced witness, Capt. Edward B. Fitzgerald.

### Interventions of J. Croissant and T. H. Sompayrac.

[3] As to the interventions for the provisions and supplies furnished the Iola while in the harbor and at her legitimate work by J. Croissant and T. H. Sompayrac, the evidence seems to justify a decree of liability against the tug. These supplies were furnished on the captain's orders and he knew nothing about the terms of the charter party; nor does it seem that these merchants were put upon inquiry. The liability of the tug as to all such articles furnished after the act of Congress approved June 23, 1910 (Act June 23, 1910, c. 373, 36 Stat. 604), seems beyond question.

### Intervention of W. W. Pinner, Captain.

As to the lien claimed by Capt. Pinner for the wages set forth in his intervention, it is insisted in the briefs of opposing proctors, with great earnestness, that the ancient authorities denying such lien and the more modern rulings are in conflict. The authorities cited in the

briefs have not been furnished to the court, and are not now accessible. The right of the captain to his wage or salary will be heard, and, if possible, determined, at the approaching session of the court in Savannah.

With this reservation, a decree may be framed in accordance with these rulings.