## THE CITY OF MILFORD.

(District Court, D. Maryland. October 9, 1912.)

1. MARITIME LIENS (§ 21*)—REPAIRS AND SUPPLIES—CONSTRUCTION OF STATUTE—"PERSON INTRUSTED WITH MANAGEMENT."

A corporation of Baltimore, which was in possession of a steamer, registered elsewhere, under a contract of purchase, although it had not paid the purchase price, and the title was retained by the vendor, was a "person intrusted with management," within Act June 23, 1910, c. 373, § 2, 36 Stat. 604 (U. S. Comp. St. Supp. 1911, p. 1192), and presumptively authorized to order repairs and supplies; and persons furnishing the same were entitled to a lien on the vessel therefor, in the absence of knowledge on their part, or anything to put them on inquiry, as to the terms of the contract, as required by section 3 of the act.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 26; Dec. Dig. § 21.*]

2. MARITIME LIENS (§ 24*)—REPAIRS AND SUPPLIES—CONSTRUCTION OF STATUTE.

The provision of Act June 23, 1910, c. 373, § 1, 36 Stat. 604 (U. S. Comp. St. Supp. 1911, p. 1192), that, to entitle one furnishing repairs and supplies to a vessel to a maritime lien therefor, it shall not be necessary to allege or prove that credit was given to the vessel, in the absence of any agreement on the subject, renders it immaterial whether or not the furnisher intended to give credit to the vessel.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 30; Dec. Dig. § 24.*

Maritime lien for supplies and services, presumption as to credit to vessel, see note to the George Dumois, 15 C. C. A. 679.]

In Admiralty. Suit to enforce maritime liens against the steamer City of Milford; Stephen C. Puckette, claimant. Decree for libelants.

Arthur D. Foster and John Henry Skeen, both of Baltimore, Md., for libelant.

J. Craig McLanahan, of Baltimore, Md., for intervening petitioner. Wells & McCormick, of Baltimore, Md., for respondent.

ROSE, District Judge. The original libelants, and those who subsequently filed intervening petitions or libels, will be referred to collectively as the libelants. For repairs made, supplies furnished, or services rendered they claim maritime liens upon the City of Milford, a steamboat enrolled at the custom house of the port of Georgetown, in the District of Columbia. It will be called the ship. Stephen C. Puckette, a resident of the state of Tennessee, is the claimant. He will be referred to as such. The Maryland Steamboat Company is a Delaware corporation. It will be called the company.

[1] When the indebtedness to the libelants arose, the company was an agreed purchaser of the ship. As such it was intrusted with the management thereof at the port of supply; that is, at Baltimore. There is no question that it is liable to the libelants for the amount of their claims. Orders for supplies, repairs, and services were given sometimes by the master of the ship, sometimes by its officers or members of its crew, by direction or with the knowledge and approval of the master, and sometimes by the company itself. At the time these

debts were contracted the company's possession of the ship was neither tortious nor unlawful. If these facts stood alone, under the express provisions of the act of June 23, 1910 (36 Statutes at Large, 604), the libelants would have maritime liens upon the ship. The claimant says, however, there is another side to the story. He produces the written instrument by which the company was given possession and management of the ship. It is dated the 24th of June, 1912. It recites that the claimant had that day sold the ship to the company for $26,500, of which $1,000 was paid in cash. For the remainder the company had given the claimant its promissory notes, one of which, for $1,000, was payable on the 9th day of July, 1912, and four others, for $6,125 each, were payable, respectively, on the 24th day of July, August, September, and October, 1912. The $1,000 note was paid. Nothing was paid on any of the others.

The original libel in this case was filed on the 30th of July. At about that time the company went into receivers' hands. The agreement between the company and the claimant provided that until the notes were fully paid the latter was to retain title to the ship. As further security the company assigned to him subscriptions to its stock to the amount of upwards of $26,000. Until default the company was to have the use of the ship for operations on the Chesapeake Bay. So long as any of the purchase money remained unpaid it was to remain under the control and management of the engineer of the claimant. Such engineer continued to hold that position on board the ship during the time it was in the company's possession. So far as the libelants were concerned, he appeared to be the ship's engineer and nothing more. There was nothing to suggest to them that he was not, like the other officers and the crew, a mere employé of the company.

On or before the 1st of July, 1912, the company was required to furnish good bond in the sum of $5,000, conditioned to protect the claimant against suit or damage by reason of liens or other claims against the ship arising through or under it. The bond was given. The amount of the claims proved in this case does not reach $2,500. The real parties in interest to this controversy are the libelants and the surety on this bond. The latter is carrying on the litigation in the name of the claimant. It is clearly entitled so to do. The claimant says that the libelants cannot hold the ship. He contends that by the exercise of reasonable diligence they could have ascertained that, because of the terms of the agreement for sale of the ship, the company was without authority to bind it.

There is nothing in the evidence to suggest that any of the libelants had notice that the company was not the sole owner of the ship. A number of them proved that, before extending credit, they were told that the company owned the ship. These statements were made by its agents, acting for it in the premises. Only one witness was produced on behalf of the claimant. He is the gentleman, who during the short business life of the company, was its vice president and general manager. Some of the libelants had testified that he told them that the company owned the ship. He says that in so testifying some of them

are mistaken. He is not prepared to deny that he may have made such a statement to the representative of one of the libelants. He does not remember whether he did or did not. It is quite possible that he does not accurately recall everything that in this connection he said to some of the others. I am persuaded that those witnesses who have testified that he and the other agents of the company led them to believe that it was the owner of the ship have testified truthfully and accurately.

The claimant's engineer in person gave the orders for some of the supplies, repairs, or services. He approved the bills for others. He was not produced as a witness, nor was the claimant, or any agent or employé of the claimant, put upon the stand. The latter says that, had the libelants exercised the reasonable diligence required by the statute, they would have made further inquiry before extending credit. He points out that the company's business office was in Baltimore. That was the port of supply. It would have been easy for the libelants, who were all Baltimoreans, to have made inquiries at its office. If they had, the person to whom they would have addressed their questions presumably would have been the gentleman who told several of them that the company owned the ship.

It does not appear that any inquiries made at the company's office would have given the libelants any other or different information from that which they received. Doubtless, had the libelants cross-examined the general manager of the company as to whether his company had fully paid for the ship, and, if it had not, what rights the vendor had retained therein, they would have received truthful answers. They could have had the records of the Georgetown custom house searched. They could have there learned who appeared to be its owner. They might or might not have been able to find him, or some agent of his. If they had come up with either, they could have learned the true state of the case.

Did the act require them to do all this? Its purpose was to simplify the law. There was need for it. The battle as to the liability of a ship for materials and services furnished it has been going on for centuries. Judge Lowell, in that wonderfully learned and exhaustive opinion of his in The Underwriter (D. C.) 119 Fed. 713, tells the story of the long struggle. He shows how the questions of substantive law and of policy involved had in the course of hundreds of years become confused and complicated, by being mixed up with differences as to rules of procedure and with disputes as to jurisdiction between the courts of admiralty and those of common law. Rights of materialmen might depend upon whether, when they furnished supplies, the ship was in a foreign or in a domestic port. In this country a port of another state was a foreign port. A materialman at Buffalo, who there put supplies on board of a ship owned in New York City, might not have a lien. If like supplies were furnished the ship when she was lying in Jersey City, within sight of the owner's office in Manhattan, the ship would be bound for them. The distinction between foreign and domestic ports had come to be without substantial reason. Congress, in the act referred to, has abolished it.

As the law stood before Congress spoke, a materialman would under some circumstances have a lien, if he could prove that he had given credit to the ship, while he would not have it, if it appeared that he had trusted the owner. When it became necessary to go into an inquiry as to whether he had furnished the supplies on the credit of the ship or of the owner, the less scrupulous he was the better the chance of his getting his money. Congress said that for the future it should not be necessary to allege or prove that credit was given to the vessel.

Compliance with the requirement of a state statute was in many cases a necessary condition precedent to the successful assertion of a lien against the ship. Those statutes differed. Many, if not most, of them required lien claims to be filed in some state office, yet the liens were not enforceable in the state courts. Such requirements had ceased to serve any useful purpose. The act in terms superseded the provisions of all such state statutes.

Under some circumstances, as the law formerly was, a supply man might have a lien, had he made his bargain with the master, and not with the owner. It is possible that under some other states of fact the reverse might have been true. The act declares that the lien shall exist when the supplies had been furnished upon the order of the owner or owners of a vessel, or of a person by him or them authorized. It says that authority from the owner to procure supplies shall be presumed to have been given to the managing owner, the ship's husband, the master, or any person to whom the management of the vessel at the port of supply is intrusted, including therein such officers and agents, when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel.

The general purpose of this enactment is plain. Hereafter, when supplies are furnished for a ship to one lawfully having the management of the ship, the presumption is that the ship is liable for them. If the materialman knows nothing about the authority of the person in possession of the ship, except that he visibly has the management of it, he may furnish the supplies, and the ship will be bound for them. But he may know something more. He may have knowledge that the person intrusted with the management of the ship has, by agreement with the real owner of the ship, no right to subject it to liens. If, under such circumstances, a materialman furnishes supplies, he cannot hold the ship. If he could, he would profit by his own wrong. Even when he does not know certainly that the person having the management of the ship has no authority to bind it, he may have learned such facts or circumstances as will suggest to him the probability that such may be the case. If so, he may not shut his eyes and his ears to further inquiry. He cannot say:

"I admit that I heard something which, if true, indicated that the person who was ordering the supplies had no right to bind the ship for them; but I did not know whether that which I had heard was true or not. I could easily have made inquiries, and, if I had inquired, I would have found out the truth; but I did not do so."

He who is so careless of other men's rights will find that his own will be determined, not by what he absolutely knew, but by what it was in his power to find out, if he had acted with ordinary and reasonable care. And so the act provides that nothing in it shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of the charter party, or agreement for sale of the vessel or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.

Before this proviso can have any application, something must have occurred to put the furnisher of the supplies upon inquiry. The proviso is a proviso. It is to be understood in such sense as will harmonize it with the general purpose of the act. That purpose was to make the management of a vessel at its port of supply presumptive evidence of the right to bind it for supplies there furnished. That purpose prevails unless it shall be shown that the person so managing the vessel was unlawfully or tortiously in possession or charge of it, or unless something has been brought to the knowledge or attention of the person furnishing the supplies which in honesty and good conscience puts upon him the duty of inquiry as to whether the person who has the management of the ship has the right to pledge its credit. The Iola (D. C.) 189 Fed. 979; The Ha Ha (D. C.) 195 Fed. 1013; The Thomas W. Rodgers (D. C.) 197 Fed. 772.

The cases cited by the learned advocates for the claimant have been carefully considered. Those of them in which the facts are at all similar were decided before the radical change of law brought about by the enactment of the act of 1910.

It is neither necessary nor appropriate to attempt to suggest what circumstances will be sufficient to put a supply man upon inquiry. In this case it is not contended that there were any. Moreover, the agent of the claimant was on the vessel, knew that all these supplies were being furnished to it, himself ordered an appreciable portion of them, and did nothing to warn those who were supplying them that the ship was not to be bound for them.

[2] It is contended that in any event the intervening libel of Minton & Denton must be dismissed. One of the firm had testified that the amount of their claim was the correct amount due by the ship; that the bill had been made out to the ship in accordance with what he said was the custom. He was then asked:

"Whom did you trust, to whose credit did you sell these goods—the steamer's credit, or the Maryland Steamboat Company's credit?"

He answered:

"The Maryland Steamboat Company, as owners."

He subsequently said that he had given credit to the ship. The larger part of his bill was actually ordered by the engineer, who was the actual, although, so far as the libelants were concerned, the undisclosed, agent of the claimant.

The provision of the act which says that it shall not be necessary to allege or to prove that credit was given to the vessel was intended in part to render irrelevant inquiries made of the witness as to his state of mind at the time he furnished the supplies.

Taking into account the whole testimony of the witness and all the circumstances, the reasonable conclusion is that his firm, like the rest of the supply men, have a maritime lien upon the ship for the amount of their claim.

A decree will be entered in accordance with the conclusions stated in this opinion.