## THE LOUIS DOLIVE.

### (District Court, E. D. Louisiana. July 19, 1916.)

### No. 14569.

1. MARITIME LIENS ⟐66—RIGHT TO LIEN—DILIGENCE.

Due diligence in ascertaining the authority of one ordering supplies for a vessel, which is necessary before a maritime lien can be secured on the vessel, is largely a question of fact depending on the particular circumstances of each case.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 104; Dec. Dig. ⟐66.]

2. MARITIME LIENS ⟐30—RIGHT TO LIEN—DILIGENCE.

One furnishing supplies on the order of the person in charge of a vessel and seeking a maritime lien therefor is not absolved from all inquiry in every case by want of notice as to the authority of such person.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 37, 38; Dec. Dig. ⟐30.]

3. MARITIME LIENS ⟐30—RIGHT TO LIEN—DILIGENCE.

The owner of a vessel before charter had dealings with claimant, supplies being charged directly to the vessel, and bills being paid by the owner. After the charterer took possession of the vessel, supplies were ordered by the captain of the vessel, who was known to claimant, and for some time they were paid for promptly. The owner did not notify claimant that the vessel had been chartered. *Held*, that the claimant in furnishing necessary supplies and charging them to the vessel was not guilty of lack of due diligence, and so was entitled to a maritime lien against the vessel, for the owner might reasonably have informed claimant of the charter party.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 37, 38; Dec. Dig. ⟐30.]

4. MARITIME LIENS ⟐30—RIGHT TO LIEN—DILIGENCE.

Before the chartering of a vessel, the manager of the corporate owner had occasionally ordered coal for her from claimant; but claimant knew the boat burned wood as well as coal and usually obtained her fuel at another place. After the vessel was chartered, the president of the corporate charterer made arrangements with claimant to furnish coal to the vessel, the coal being delivered in an entirely different manner. Claimant made no inquiry as to the authority of the president of the charterer to impose liens on the vessel, and the coal was used for the purpose of enabling the vessel to make round trips across the lake in which it plied. *Held*, that claimant did not use sufficient diligence, particularly in view of the fact that the coal was not ordered by the master, and so was not entitled to a maritime lien.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 37, 38; Dec. Dig. ⟐30.]

5. MARITIME LIENS ⟐65—RIGHT TO—EVIDENCE.

Where no evidence was offered in support of a claim for maritime lien, the libel will be denied.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 103; Dec. Dig. ⟐65.]

6. MARITIME LIENS ⟐62—ENFORCEMENT—PARTIES—PETITION.

In a proceeding to enforce maritime liens on a vessel which had been chartered, where the owner intervened claiming the vessel, the court might

⟐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

in its discretion allow the owner to file a petition against the charterer to obtain reimbursement for any lien perfected against the vessel.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 100; Dec. Dig. &#9758;62.]

7. SHIPPING &#9758;50—CHARTER PARTIES—RIGHT OF CHARTERER.

The charterer did not pay for necessary supplies furnished a vessel and a lien was obtained against it. The charter party provided that the charterer should make repairs on the vessel and should be reimbursed out of the money due on the charter party. The charterer retained sufficient to reimburse itself for the repairs contemplated. *Held*, that the owner was in such case entitled to reimbursement to the amount of the liens.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 150–155; Dec. Dig. &#9758;50.]

8. MARITIME LIENS &#9758;56—ENFORCEMENT—PARTIES.

Where, in a proceeding to enforce maritime liens on a vessel, the owner intervened claiming the vessel and then filed a petition against the corporate charterer, the owner cannot in that proceeding set up the defective incorporation of the charterer and try out the question of the liability of stockholders of the charterer.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 95; Dec. Dig. &#9758;56.]

In Admiralty. Libel by the Kittredge-Waters Supply Company against the steamer Louis Dolive, in which the Robert P. Hyams Coal Company, Limited, and others, intervened; the vessel being claimed by the St. Tammany Steamship Company as owner, which filed a petition against the charterer. Decrees sustaining the lien of libelant and the petition of the claimant owner.

John D. Grace, of New Orleans, La., for libelant.

Rice & Montgomery, of New Orleans, La., for claimants.

Jas. E. Zunts, of New Orleans, La., for intervener Robt. P. Hyams Coal Co. and others.

Buck, Walshe & Buck, of New Orleans, La., for intervener Tennessee Coal, Iron & Ry. Co.

John Dymond, Jr., and A. Giffen Levy, both of New Orleans, La., for intervener Pineland Realty Co.

Grant & Grant and Eraste Vidrine, all of New Orleans, La., for Lancaster and others.

FOSTER, District Judge. In this case the Kittredge-Waters Supply Company filed a libel against the steamer Louis Dolive to recover for supplies furnished, and other materialmen intervened, to wit, Robert P. Hyams Coal Company, Limited, Tennessee Coal, Iron & Railroad Company, Carpenter & Hillman, and Pine Lands Realty Company. The vessel was seized, but was claimed by the St. Tammany Steamship Company as owner. The owner answered the libel and intervening libels and denied that any maritime liens existed on the vessel, on the ground that, at the time the supplies were furnished, the vessel was being operated under a charter by the Mandeville Steamboat Company, Limited, and the charterer was not authorized to create liens on the boat. The owner also filed a petition against the charterer and several of its officers and stockholders, to wit, William B. Lancaster, John E. John-

son, and Earnest J. Bagur, calling them in warranty and praying for judgment over against them for any amounts adjudged to be liens on the vessel. The charterer and the individuals named excepted to the regularity of the proceeding on the ground that a suit in personam could not be cumulated with an action in rem. These exceptions were overruled. 211 Fed. 783. Answers to the petitions were filed setting up the unseaworthiness of the vessel when delivered to the charterer, the expenditure of an amount for her repair exceeding the total of the claims against the vessel as an offset, and other defenses personal to the individuals. These various and somewhat complicated issues were referred to a commissioner to take the proof; but he submitted no report, and the matter was finally argued in open court on the pleadings and the evidence taken before the commissioner. The facts will appear in the course of the opinion.

The Louis Dolive, a side-wheel steamer, was owned by the St. Tammany Steamship Company, a Louisiana corporation, and was operated by it for some time on Lake Pontchartrain and its tributaries between New Orleans and other points in Louisiana. On November 1, 1911, it chartered the boat to the Mandeville Steamboat Company, another Louisiana corporation; her use being restricted to the same waters. The transfer of the vessel was complete. The charterer appointed a master and crew and agreed to return the boat in good order, free from all liens and incumbrances. The charter was for two months with the right to extend for ten months, and this was availed of by the charterer. Whether any liens were acquired on the boat depends on the Act of June 23, 1910, c. 373, 36 Stat. 604 (Comp. St. 1913, §§ 7783–7787). The act creates a lien on foreign and domestic ships for necessaries furnished upon the order of the owner or of any person lawfully in possession, including a charterer or an owner pro hac vice, but with the proviso that no lien will arise if the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of the charter party the person ordering the necessaries was without authority to bind the vessel. In this case, by the terms of the charter party the charterer was without authority to bind the vessel, but was lawfully in possession as owner pro hac vice. Therefore the question as to whether the materialmen used due diligence is of paramount importance.

## Claim of Kittredge-Waters Supply Company.

[1-3] With regard to this claim, it appears that the Louis Dolive had been dealing with the claimant prior to the charter. Supplies were charged directly to the vessel, and the bills were usually promptly paid by the owner. When the charterer took charge of the vessel, she continued to deal with the claimant, charges were made as before, and the bills were paid promptly for a while. When the supplies forming the basis of the claim were delivered, Capt. Badeau, who had formerly commanded the Dolive on the appointment of the owner, was in command. All of the supplies were ordered by him, or by the chief engineer or other members of the crew with his express authorization. When the account was not paid with the usual prompt-

ness, the secretary and credit man of the claimant looked in the newspaper for the advertisement of the vessel and discovered that the agent was Earnest J. Bagur, who was secretary of the charterer. The advertisement is not in evidence, and it does not appear that it conveyed notice that the Dolive was being operated by virtue of a charter, and furthermore, all, or nearly all, of the supplies had been furnished at that time. When Capt. Badeau ordered the supplies, the claimant made no inquiry of him as to whom he was employed by, and he said nothing at all on the subject. The supplies were necessary and were used on the boat. They consisted mainly of articles for the engine room, with the exception of a considerable number of bolts and stirrups that were used to permanently repair one of the paddle wheels. One or two other captains had preceded Capt. Badeau, but it is shown captains on Lake Pontchartrain frequently change vessels, and all of them were well known to the claimant, and no questions ever arose as to the payment of bills contracted by them for the vessel. It would be impracticable for the owner of a vessel chartering her to another to give special notice to every one from whom the charterer might be expected to buy supplies, but it would be an easy matter for him to give notice in some form to those that he formerly had regularly dealt with. Due diligence is mainly a question of fact depending on the particular circumstances of each case. A materialman is not absolved from all inquiry in every case by want of notice as to the authority of the person in charge of the vessel. For instance, he is always put upon inquiry as to the necessity for the supplies. The Grapeshot, 9 Wall. 129, 19 L. Ed. 651. But in this case the boat had been dealing with this claimant before her charter and the supplies were ordered by the captain, who had formerly been employed by the owner. The boat was running in the same trade, there was nothing to put claimant on notice of the changed condition of her operation, and the vessel's dealings might well have been considered a continuance of the old account. Except as to the necessity for the supplies, claimant was not required to make inquiry as to the authority of the captain to order them. As the supplies were in fact necessary, the failure to inquire as to this feature is immaterial. Under all the circumstances, claimant has not been guilty of a lack of due diligence. The supplies were necessary, were ordered by the captain, and were of benefit to the owner. The vessel was impliedly hypothecated, and the lien will be allowed. The George Dumois, 68 Fed. 926, 15 C. C. A. 675; The Malola (D. C.) 214 Fed. 308; The City of Milford (D. C.) 199 Fed. 956; The Iola (D. C.) 189 Fed. 972.

### Claim of Robert P. Hyams Coal Company.

[4] With regard to this claim, it appears that, prior to the chartering of the Dolive, Thomas Ellis, manager of the St. Tammany Steamship Company, the owner of the boat, had occasionally ordered coal for her from claimant; but claimant knew the boat burned wood as well as coal and that she usually got her fuel at Mandeville, La. All of the coal ordered by Ellis was delivered in wagons directly to the boat. About a year after the last order from the owner, W. B.

Lancaster, president of the Mandeville Steamboat Company, made arrangements with the claimant to supply the Dolive with coal. W. P. Hyams, president of the claimant, testifies that he sold the coal to Lancaster and looked to him for payment; that he made no inquiries as to who was running the boat, or by what authority Lancaster ordered coal on her faith and credit; that he never makes any investigation in any case before delivering coal to a vessel, but always looks to the vessel. Claimant sold and delivered quite a considerable amount of coal, charging it in each instance to the boat, and, except for the last five carloads, it was all paid for; the bills being presented and paid at Lancaster's office. Lancaster was principally engaged in the real estate business, and claimant knew this. The coal was delivered to the railroad company and transported to Spanish Fort, a suburb of New Orleans on Lake Pontchartrain, and there dumped into a bin, and the vessel coaled from this bin. Occasionally the captain of the vessel would telephone to the claimant for the delivery of the coal, but it cannot be considered the captain ordered any of the coal, and it is not shown that the captain had anything whatever to do with the coal in controversy here. It is shown that the Dolive during the term of the charter got coal nowhere but at Spanish Fort, but it is not shown that all the coal dumped in the bin was in fact used on the Dolive. The Dolive was making short daily trips from her home port to Mandeville directly across Lake Pontchartrain. She required five or six tons of coal for the round trip, worth not over $20; but the claim was allowed to accumulate until it reached over $630. Such an amount of coal was not needed to preserve the vessel or to enable her to complete a voyage and was of no benefit to the owner of the boat. In my opinion any one opening a new running account with a steamboat, especially in her home port and when her supplies are not ordered by her captain, is charged with the duty of at least inquiring as to the authority of the person ordering the supplies to bind the vessel, if he intends to rely upon the credit of the vessel for payment. This claimant could not have considered, and in fact did not consider, that the account was a continuing one with the owner. Had it made the least inquiry, it would have discovered the terms of the charter party. Mere belief, in good faith, that one has a lien on a vessel for supplies furnished, does not create a lien.

Under the circumstances, I do not consider claimant has used due diligence. The lien will be denied and the intervening libel will be dismissed without prejudice. The Eureka (D. C.) 209 Fed. 373; The Iola (D. C.) 189 Fed. 972; The Kate, 164 U. S. 458, 17 Sup. Ct. 135, 41 L. Ed. 512; The Valencia, 166 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710.

### Claims of the Tennessee Coal, Iron & Railroad Company, and Carpenter & Hillman.

These claims are in exactly the same condition as the Hyams claim with regard to the delivery of the coal and the failure to make the least inquiries. Furthermore, neither of these claimants came in con-

tact even with the charterer, as the coal was ordered from them by Hughes, a broker, and no attempt has been made to show his authority.

Liens will therefore be denied, and the intervening libels will be dismissed without prejudice.

### Claim of the Pine Lands Realty Company.

[5] No evidence whatever has been offered to support this claim. It will therefore be denied, and the intervening libel dismissed without prejudice.

[6] With regard to the issues as between the St. Tammany Steamship Company and the Mandeville Steamboat Company, my attention has been called to the recent case of the Wilhelmina, 232 Fed. 430, —— C. C. A. ——, on the question of the propriety of rendering judgment over against the charterer in these proceedings on the petition calling it in warranty. To that case might be added The Ruth, 186 Fed. 87, 108 C. C. A. 199. Both cases uphold the discretion of the court in allowing a petition calling a charterer in warranty and are not in conflict with other cases on the same subject. I see no occasion to change the views expressed when overruling the exception to the petition. The Louis Dolive (D. C.) 211 Fed. 783. And in this regard see The Planet Venus (D. C.) 113 Fed. 388; Evans v. New York & P. S. S. Co. (D. C.) 163 Fed. 407; and O'Keefe v. Staples Coal Company (D. C.) 201 Fed. 133.

[7] As to the offset claimed, it appears that the charterer made considerable repairs to the Dolive. It is clear, however, that these were agreed to be made by the charterer, except as to a small proportion of same. As to this proportion to be paid for by the owner, it was agreed that the cost should be deducted from the charter money, and it appears that the charterer has retained more than sufficient to reimburse itself. The charter also sets up a partnership agreement with the owner, but the proof is that the agreement was with a Mr. Clay Riggs personally, and not with the owner. Furthermore, Riggs was not authorized to bind the owner.

[8] The owner has endeavored to inject into the case questions concerning the legality vel non of the incorporation of the Mandeville Steamboat Company and is seeking personal judgment against Lancaster and the other stockholders named, on the theory that the concern is a partnership and not a corporation. To go into these questions would complicate the case to an extent not contemplated by the permission to call the charterer in warranty. If there is any personal liability on the stockholders of the charterer to the owner, it arises from the law of Louisiana, and not from the contract between the parties. I considered it proper to permit the cumulation of an action in personam by the owner against the charterer with the action in rem by the materialmen against the vessel, as the liability was primarily that of the charterer; but the line must be drawn somewhere.

The St. Tammany Steamship Company will have judgment over against the Mandeville Steamboat Company for the amount allowed

the Kittredge-Waters Supply Company.   As against the individuals named, the petition will be dismissed without prejudice.

Decrees may be drawn in accordance with the above, costs to follow the decrees, and, unless apportioned by agreement, may be taxed on motion.