**F. E. GRAUWILLER TRANSPORTATION CO., Inc., as owner of THE JEANNE now designated as K–18, Libelant,**

v.

**Charles J. KING and Joseph P. Elliott, The Jeanne, her tackle, apparel, etc., Respondents.**

**RODERMOND INDUSTRIES, Inc., Libelant,**

v.

**THE JEANNE, etc., and against Charles J. King, Inc., F. E. Grauwiller Transportation Co., Inc., Joseph P. Elliott, et al., Respondents.**

**Joseph P. ELLIOTT, Cross-Libelant,**

v.

**THE JEANNE, now designated as K–18, and William E. Searfoss and F. E. Grauwiller Transportation Co., Inc., and all persons lawfully intervening for their interest in said vessel, in a cause of salvage, contract, and possession, etc., Cross-Claimant-Respondent,**

**William E. Searfoss, Cross-Respondent.**

Nos. 20335, 20337, 20338.

United States District Court
E. D. New York.
April 22, 1955.

**632**

Mahar & Mason, New York City, Frank C. Mason, New York City, of counsel, for libelant, F. E. Grauwiller Transp. Co., Inc.

Macklin, Speer, Hanan & McKernan, New York City, Gerald J. McKernan, Charles J. Carroll, Jr., James N. Allan, New York City, of counsel, for cross-libelant.

Haight, Deming, Gardner, Poor & Havens, New York City, Thomas K. Roche, Edward L. Johnson, Robert M. Julian, New York City, of counsel, for libelant, Rodermond Industries, Inc.

BRUCHHAUSEN, District Judge.

This consolidated cause involves three actions. The first suit is by F. E. Grauwiller Transportation Co., Inc., as owner of the scow Jeanne against the respondents, Elliott, King and Charles J. King, Inc., to recover possession of the scow. The second suit is by Elliott against the scow, her owner and its president, Searfoss, for money damages and for possession of the scow. The third suit is by Rodermond Industries, Inc., against the scow and all other parties for the cost of repairs to the scow and for a maritime lien therefor.

It is conceded that Grauwiller in November 1953 and prior thereto owned the scow Jeanne; that it was wrecked during that month in a storm at College Point, Long Island; that the respondent Elliott made repairs to the scow and caused it to be towed to the plant of Rodermond Industries, Inc., in New Jersey where repairs were made, valued at $6,299 and that it was then taken to the dock of the respondent King, an associate of Elliott.

The main issue litigated at the trial was whether Elliott transported the scow without the permission of the owner, Grauwiller. If, as claimed by Grauwiller, Elliott unlawfully took possession of the scow, then Rodermond Industries, Inc., is not entitled to a maritime lien on the scow for the cost of the repairs made by it.

The facts not in dispute are that the libelant, Grauwiller Co., took title to the scow Jeanne in January 1953; that in a storm in November 1953, while the scow was in the waters adjacent to the yard of The Sound Shipbuilding Company at College Point, a concern with which Grauwiller did business, it was propelled on top of a wrecked vessel and itself was wrecked; that Elliott had been working in the vicinity on or about a ship called the McCormack No. 16; that on August 9, 1954, he attempted to move the scow Jeanne with the aid of a tug, but without success; that on or about August 31, 1954, employees of the Shipbuilding Company attempted to move the scow, but failed; that on September 11, 1954, Elliott made another attempt to move the scow and succeeded in having it towed to Rodermond's yard in New Jersey, where repairs were made and that it was later towed to the respondent King's dock at Newtown Creek.

To determine the question of Elliott's alleged right of possession of the scow, it is necessary to analyze the claims and the testimony offered in support thereof.

In substance, Elliott states that he is an experienced diver and familiar with the repair and floating of vessels; that in February, March and April 1954, he had a number of telephone conversations with Searfoss, the president of The Grauwiller Company and that Searfoss told him he could have the scow, but couldn't give him a bill of sale until after the first of January, 1955; that he plugged up the holes in the scow and that on August 9, 1954, with the aid of a tug he attempted to move it and failed; that on August 31, 1954, he wrote to Searfoss that he intended to move the scow and use it for a bulkhead and that he understood that he would later receive a bill of sale and hoped this would meet with the approval of Searfoss; that on September 11, 1954, he caused the scow to be moved and towed to Rodermond's; that after repairs were there

made it was towed to King's dock and that the name K–18 was substituted for the name Jeanne.

The testimony of the libelant's witness Searfoss and a number of officers and employees of The Sound Shipbuilding Company, in substance, is that not only was Elliott not given permission to remove the scow but he was specifically instructed not to take it.

Searfoss, in substance, testified that he never did business with Elliott; that when Elliott telephoned him in February 1954, he told him that he couldn't have the scow; that when he learned of Elliott's attempt on August 9th to take the scow he instructed the Shipbuilding Company to take steps to prevent him from removing the scow; that within a few days thereafter he directed Roche, the president of the Shipbuilding Company, to attempt to move the scow at the next time of high water; that when he later learned that the scow was at King's dock, he instructed his attorney to take the necessary legal steps for possession.

Roche testified that when he received the call from Searfoss he told Daly, the yard superintendent, about it and also informed the guard at the yard not to allow Elliott to enter it; that after the first attempt was made by Elliott to remove the scow, efforts were made by his employees to do so.

Daly, the superintendent of the yard, testified that, pursuant to Roche's instructions, in the latter part of August he made a similar attempt but was unsuccessful.

Grutzner, the operator of the motor boat for the Shipbuilding Company, testified that his function was to shift barges, taking them out to deeper water to the various tugs; that on August 9, 1954, the day of the first attempt by Elliott to move the scow, after the yard was closed for the day, he was requested by Elliott to assist in moving the scow; that he made a report of it to his office; that he knew that Elliott had used the same tug to move the McCormack No. 16, on a prior occasion; that he was later informed that Elliott was not supposed to take the scow Jeanne; that on the second attempt to move it, which was late in August, he assisted Daly; that on the day of the third attempt (which occurred on September 11 and was successful) Elliott came to the yard; that it was Saturday and the yard was closed; that upon the sight of a tug coming toward the dock, Grutzner asked Elliott, "Is that tug coming for the scow?"; that Elliott said: "Yes", to which Grutzner replied "You aren't supposed to take that boat"; that thereupon Elliott answered: "It is all straightened out now". (S.M. 258.) On his direct examination, Elliott stated that he told Grutzner "I wrote a letter to Mr. Searfoss and to Mr. Roche and everything was all right as far as I know".

The witnesses Baard, the timekeeper, and Grabher, the guard at the yard, testified on behalf of the libelant Grauwiller Transportation Company, that they had instructions to keep Elliott out of the yard. Elliott's testimony that he came to the yard and worked on the Jeanne during a considerable period of time, attempting to establish that he came there and was permitted to repair the Jeanne or that those associated with the yard, acquiesced in his operations, was refuted, and credibly so, by a number of the witnesses for the libelant.

The fact that Elliott or King physically changed the name of the scow to the K–18 and the weak explanation therefor, together with all of the credible testimony brings the Court to the conclusion that Elliott had neither rightful title or possession of the scow and that, at all times, Grauwiller was possessed of all rights thereto and is entitled to the relief sought by it in its libel and complaint.

Inasmuch as the respondent Elliott had no lawful claim to the possession of the scow, having taken possession of it tortiously and without the consent of the owner, he had no authority to procure the furnishing of repairs thereto

and obligate the owner therefor or subject the scow to a maritime lien therefor in favor of Rodermond Industries, Inc., the party furnishing the repairs to the scow. The statute on maritime liens, 46 U.S.C.A. §§ 971–973, and particularly Section 972 thereof provides that "No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel." The facts in the case of The City of Milford, D.C., 199 F. 956, 959, cited by Rodermond, were not similar to those in the case at bar. In the Milford case, it appeared that The Maryland Steamboat Company was in possession of the vessel, The City of Milford, under a contract of purchase, and that it had not paid the purchase price and that title was retained by the vendor. The Court in that case held the company to be a "person intrusted with the management" within the meaning of the statute and further, that the company was presumptively authorized to order repairs and that the persons furnishing the same were entitled to a lien on the vessel therefor, in the absence of knowledge on their part or anything to put them on inquiry, as to the terms of the contract, as required by Section 3 of the Act, 36 Stat. 604 (Section 973 of 46 U.S.C.A.). The statute provides that persons in the various categories therein mentioned including "any person to whom the management of the vessel at the port of supply is intrusted" shall be presumed to have authority from the owner to procure repairs. But even under those circumstances a lien may not be conferred if, as stated in Section 973, "the furnisher (of the repairs) knew, or by exercise of reasonable diligence could have ascertained, that * * * the person ordering the repairs * * * was without authority to bind the vessel therefor." It is plain that Elliott did not have a contract for the purchase of the scow and that its owner, Grauwiller, did not intrust him with its management. No presumption can possibly arise that an individual in Elliott's position, who obtained possession of the scow unlawfully, could be deemed to be intrusted with its management. In fact, 199 F. at page 960 of The City of Milford case the Court pointed out that the presumption does not exist where possession of the vessel is obtained unlawfully.

The further contention of Grauwiller that the scow was a dead ship in that it was completely withdrawn from commerce, and therefore not subject to a maritime lien lacks merit. While it is true that no such lien, whether based on a claim for wharfage or repairs can be created against a dead ship, Murray v. Schwartz, 2 Cir., 175 F.2d 72; Hanna v. The Meteor, 2 Cir., 179 F.2d 957, it was not established that the Grauwiller scow had been withdrawn from navigation. An example of a dead ship is one kept at a wharf for the mere purpose of storage as in the case of The Poznan, 2 Cir., 9 F.2d 838, 843. The Court therein distinguished between a dead ship and one considered to be in navigation by stating: "She (the vessel) is not at the dock for passengers, for freight, for repairs, or any purpose preceding or succeeding the actual voyage." It would seem that the element of intent of the use of a vessel for the purposes of navigation, evidenced by facts supporting such intent, is a principal factor in the determination of the question. It is clear, under The Poznan case, that a vessel under repair, preceding the actual voyage, is not a dead ship.

The respondent, Elliott, contends that if Grauwiller recovers possession of the scow Jeanne in her present seaworthy condition, brought about by extensive and costly repairs made at the Rodermond yard, then Grauwiller will have been unjustly enriched. The case of Shooters Island Shipyard Co. v. Standard Shipbuilding Corporation, 3 Cir., 293 F. 706, cited by Elliott, does not aid him. The Court in 293 F. at page 714 thereof holds that a valid claim for unjust enrichment can only be based upon "an element of misconduct or fault, or undue advantage taken by one party of another." There is no evidence thereof in this case.

The case of The J. Oswald Boyd, D.C., 53 F.Supp. 103, 105, cited by the libelant, supports its position. It appeared therein that the libelant, Beatty, was the owner of a one-half interest in a vessel, wrecked and sunk in a storm; that the successor owners of the remaining half interest in the vessel expended the sum of $3,000 in raising it, and then sold it for scrap, subject to the libelant's claim for damages for the wrongful conversion of his one-half interest. The Court said:

"* * * the decision as to whether the owner can recover the original or augmented value is dependent upon whether the conversion was innocent or wilful. * * * If wilful, the owner is permitted to recover the enhanced value of the property. The ground for allowing such recovery is that to permit such a person to receive credit for his efforts or expenditures would be to enable him to profit by his own wrong and furnish encouragement and reward to the stealing of property. On the other hand, if the conversion was innocent, the owner can recover only the original value of the property."

Inasmuch as there was an unlawful taking of the scow Jeanne from Grauwiller, the enhancement in value thereto by way of the repairs made to it belongs to Grauwiller.

The Court also finds that Elliott was duly authorized by Charles J. King, Inc., to employ Rodermond to make the repairs and that the sum of $6,299 is the fair and reasonable value thereof. Under the circumstances neither Elliott nor King individually are liable therefor.

The libelant, Grauwiller, is entitled to a decree under its libel for possession of the scow Jeanne, also known as K–18; the cross libel of Elliott is dismissed, the libel of Rodermond is dismissed as to the said scow and its owner and as to Elliott and King, individually, and Rodermond is entitled under its libel for its damages amounting to $6,299, with interest and costs against Charles J. King, Inc.

Settle decree on notice.