### THE H. C. GRADY.

### BLACK DIAMOND COAL-MIN. CO. v. THE H. C. GRADY (STRONG, Intervener).

#### District Court, N. D. California. March 2, 1898.)

#### No. 11,369.

1. CONDITIONAL SALE OF VESSEL.
   Where, under a contract for the sale of a vessel, part of the purchase price is paid down, and the vendor retains the legal title as security for the balance, the transaction is a conditional sale, and not a sale with reservation of a lien, though the vendor may have believed the contrary.

2. MARITIME LAW—AUTHORITY OF SHIPMASTER.
   The master of a ship in a foreign port, in the absence of the owner, has authority, under the general maritime law, to bind his owners for necessary repairs and supplies; and interested parties may assume that he has such authority, unless something appears to suggest the contrary, and put them on inquiry.

3. SAME—FOREIGN PORT.
   With reference to any vessel, any port is considered foreign which is outside of the state where she belongs.

4. SAME—PLEDGING CREDIT OF SHIP.
   Where a steam vessel has been conditionally sold, and repairs are being made to her by order of the vendees in possession, directions given by the master to the workmen that the work must be finished by a certain date do not bind the ship for the cost of the repairs.

5. SAME.
   Possession of a vessel under an agreement for sale does not confer upon the vendee an apparent authority to create liens for supplies; and a person furnishing supplies upon the order of such a person is put upon inquiry as to his actual authority.

6. MARITIME LIEN—SERVICES.
   One who, at the time of rendering services as a purser on board of a steamer, is a part owner of the steamer under an equitable agreement for its purchase, and who is also a partner in the business in which she is engaged, is not entitled to enforce a maritime lien for his services as against the vendor of the steamer.

**7. SAME.**
  One employed as traveling agent for a vessel, soliciting trade for her at different points along her route, is not engaged in rendering a maritime service, and hence is not entitled to enforce a lien against the vessel for his compensation, though he is accustomed to give occasional assistance to her crew.

Morris M. Estee, for libelants and certain interveners.

Andros & Frank, D. T. Sullivan, H. W. Hutton, Craig & Craig, W. G. Holmes, John J. O'Toole, W. H. Schooler, and A. J. Treat, for certain interveners.

DE HAVEN, District Judge. Independent libels were filed by various persons against the steamer H. C. Grady, for supplies furnished in this state for its use, and for work done and materials furnished in this state, for its repair and equipment, and for services rendered on board said steamer. These actions were, by order of the court, consolidated and tried at the same time. Fred R. Strong appeared in the action, and filed a libel of intervention, making answer to the different libels filed, and further asking that he be given judgment against the proceeds of the sale of the steamer, for the sum of $2,750 and legal interest on that sum from the 16th day of July, 1897. In his libel of intervention, he alleges that the steamer was on July 16, 1897, sold by him to W. D. Newhouse, James B. Brooks, Nathan Crocker, J. B. Tilley, and Edward Loughery, for the sum of $3,750,—$1,000 to be paid on her delivery to the purchasers, and the balance, of $2,750, to be paid within 60 days thereafter; and that he "then and there delivered said vessel to said purchasers, and retained the legal title thereto, as security for the payment of said purchase price," the purchasers agreeing to keep her free from all liens and incumbrances, until such balance was paid. In another part of his libel of intervention it is alleged, in substance, that the said transaction between the intervener and the purchasers of the steamer constituted a mortgage. This latter allegation, however, is only the statement of a conclusion of law, and the question whether such transaction was a conditional sale or a mortgage is to be determined from the essential nature of the agreement itself, as disclosed by the evidence.

What was the agreement? It is not in writing, but there is no real conflict in the evidence as to its terms. The intervener, Strong, was on July 16, 1897, the owner of the H. C. Grady; and on that day he made a verbal contract to sell her to Nathan Crocker and James B. Brooks, for the sum of $3,750, the purchasers to have immediate possession. One thousand dollars of the purchase price was paid by the vendees at the time of the delivery of the vessel to them, and the remaining $2,750 was to be paid within 60 days thereafter. Strong retained the legal title, and I think it sufficiently appears from the evidence that, under the agreement, the legal title of the steamer was not to be transferred until the payment of the balance due upon the contract of purchase; and it was also agreed that the purchasers were, at their own expense, to make such repairs and changes in the construction and equipment of the steamer as they might deem necessary, and were to permit no liens to be filed against her while in their

possession, and prior to the time when they should make final payment on account of the purchase price, and Messrs. Crocker & Brooks subsequently gave to said Strong a bond to secure performance of their agreement in this respect.    Strong was a resident of Portland, Or., and, prior to her delivery to the purchasers under this agreement, the steamer was duly registered in the office of the collector of customs for that district, by the said Strong, as owner; and one James E. Denny was appointed by him as her master, and he was instructed by Strong, in effect, to look after his interests, and see that no bills were incurred against the steamer until she was fully paid for.    Denny was also the agent of Crocker & Brooks, and acted for them in the negotiation concerning the purchase and delivery of the steamer.    After Strong parted with her possession, under the agreement above stated, the steamer was brought to this state, and from the time of her arrival here until some time in September, 1897, was employed by Crocker & Brooks and others, who seem to have made some agreement with them for interests in the steamer, in carrying passengers and freight between San Francisco and different places on the Sacramento river; and, during the time while she was thus in the possession of Crocker & Brooks, supplies were furnished to the steamer by certain of the libelants; and materials furnished for her use, and repairs made upon her, and services rendered on board, by other libelants.

1. In my opinion, the contract between the intervener, Strong, and Crocker & Brooks, and under which possession of the steamer was delivered to the latter, was a conditional sale; and the nature of the contract is not changed by the fact that Strong may have believed that he held only a mortgage on the steamer for the balance of the purchase price, and that he expressed such opinion when giving his testimony in this case.    The court is not bound by the mere opinion of a party or witness in relation to the legal effect of a contract. It is sometimes difficult to determine whether, in a given case, the parties intended to make a completed sale, the vendor reserving or being given a mere lien on the property for the price, or whether the transaction was intended as a sale upon condition of payment of the purchase price.    Each case must depend upon its own facts.    In this case it is clear from the evidence that, under the agreement, the legal title to the steamer was to remain in Strong until the payment of the balance of the purchase price, and therefore payment of such balance was a condition precedent to the right of the vendees to demand a transfer of the title to the steamer. . The legal effect of such an agreement is that the sale is not absolute, but conditional, and payment of the entire purchase price is essential in order to pass the legal title. This constitutes a sale upon condition.    Harkness v. Russell, 118 U. S. 663, 7 Sup. Ct. 51; Coggill v. Railroad Co., 3 Gray, 545; Strong v. Taylor, 2 Hill, 326; Cole v. Mann, 62 N. Y. 1; Ballard v. Burgett, 40 N. Y. 314.

2. The libels of the Black Diamond Coal-Mining Company, Meyer & Akmann, H. P. Christie, and C. J. Sbarbaro may be considered together.    That of H. P. Christie is for materials furnished and used by him in making certain repairs upon the steamer, and for labor performed by him in making such repairs.    The materials were furnished

and repairs made at the request of Captain Denny, the master of the vessel. The remaining libels referred to are for supplies furnished. The evidence shows that the supplies were also furnished for the use of the steamer upon the order of Capt. Denny. Neither of the libelants made any inquiry in relation to the ownership of the steamer, or as to whether she was being operated by any person other than her owner.

It is claimed by the intervener, Strong, that, under these circumstances, the libelants are not entitled to enforce a lien against the steamer. I do not think this contention can be sustained. The person upon whose order the supplies were furnished, and repairs made, was the master of the steamer, duly appointed such by the said Strong, her registered legal owner. Strong, as before stated, was and is a resident of Portland, Or., and the supplies were furnished for the use of the steamer, and the repairs made upon her, in San Francisco. It is the rule of the general maritime law that the master, in the absence of the owner, has authority in a foreign port to bind his owners for necessary repairs and supplies. 2 Pars. Shipp. & Adm. p. 8; Bliss v. Ropes, 9 Allen, 339. When these supplies were furnished, and repairs made to the steamer H. C. Grady, her owner, Strong, was absent in Portland, Or., and the steamer was in a foreign port, within the meaning of the maritime rule just stated, as it is well settled that a port is deemed to be foreign to a vessel which is not in the state where she belongs, and where her owner resides. The Nestor, 1 Summ. 73, Fed. Cas. No. 10,126; The Canada, 7 Fed. 119; Pratt v. Reed, 19 How. 359; The Cumberland, 30 Fed. 449; Stearns v. Doe, 12 Gray, 482.

There was nothing, in the facts or circumstances under which the master contracted with either of the libelants, sufficient to suggest the slightest doubt of the actual authority of the master to order the supplies and repairs, and the libelants were therefore not required to make any inquiry as to his actual authority, but had a right to presume that he was clothed with the ordinary powers of a master, and that he was not acting in violation of instructions given him by his principal. The supplies and repairs were necessary, and therefore within the general authority of the master to procure.

3. The libels of John A. Whelan and James J. Whelan, co-partners, and McMurphy & McAvoy, may also be considered together. The claim of Whelan & Whelan is for $624.58, for materials furnished and work done in repairing the steamer, and in the construction of certain fresh-water tanks for her use. The tanks were constructed under a contract made with Nathan Crocker, one of the vendees of the steamer; and some of the repairs, although it does not clearly appear just what portion of the whole, were also made under his direction, and the remaining repairs were made upon the order of the master of the steamer, but whether before or after the libelants signed the bond hereinafter referred to does not appear.

The claim of McMurphy & McAvoy is for the sum of $763.92, for materials used and labor performed in making repairs upon the steamer. The evidence which relates to the making of the contract under which this claim arises is somewhat vague; but the conclusion

that such contract was made with Nathan Crocker, before referred to in this opinion as one of the purchasers of the steamer, seems the most probable. Certain it is, that gentleman first applied to the libelants to do the work subsequently performed by them. The libelants thereupon went on board the steamer for the purpose of ascertaining what repairs were needed to be made, and to bid on the work, and, upon examination, declined to give him a bid, because they were not able to ascertain just what repairs would be required. Subsequently, they received a telephone message to go down to the steamer, and meet the chief engineer, captain, and inspector, and "go ahead with the work." The libelant McMurphy is the only person who testified in relation to this telephone message, and he was unable to state from whom it was received; but the most reasonable presumption, in view of the surrounding circumstances, is that the message was sent by Crocker in behalf of himself and his partner, Brooks, and such was, doubtless, the understanding of the libelants at the time. In response to this message, the libelants performed the work, and furnished the materials mentioned in their libel. While the repairs were being made, Capt. Denny, the master, was on board, and more than once informed the libelants they must finish the work, so as not to delay the operation of the steamer beyond a certain date. This acquiescence of the master in the repairs made by the libelants, and his direction to hasten the completion of their work, cannot be construed as a contract on his part for its performance on the credit of the steamer. It is not claimed that the work was commenced under any contract made with the master, or in his presence, or that the master was informed that the libelants intended to rely upon the credit of the steamer, so that the acquiescence of the master does not bring the case within the principle which was made the basis of decision in The Alfred Dunois, 76 Fed. 586.

In addition to what has been said in relation to the contracts under which the several claims of Whelan & Whelan and McMurphy & McAvoy arise, it is proper to state that said libelants supposed that the steamer was responsible for the work performed and materials furnished by them, and that they would have a lien upon her for the value of such work and materials; but neither of said libelants made any inquiry regarding the ownership of the steamer, or whether Crocker & Brooks had any right to pledge the credit of the steamer for the work and materials ordered by them. On August 6, '97, when perhaps about one-half of their respective claims had accrued, Crocker & Brooks, as principals, and said libelants as sureties, executed a bond, whereby they became "jointly and severally bound unto Fred R. Strong in the sum of one thousand dollars," and upon the following conditions, recited in the bond:

"That whereas, the said Brooks and Crocker are to purchase from the said Strong the steamer H. C. Grady, and are to operate and run the said steamer; and whereas, the said steamer may be liened or libeled within 60 days from the date hereof by persons having claims against the said steamer during the time the same is operated and run by the said Brooks and Crocker, or their assigns: Now, therefore, if the steamer is not libeled or liened by persons having claims against the said steamer while operated and run by the said Brooks

and Crocker or assigns, within 60 days from date hereof, then this obligation to be null and void; otherwise, to remain in full force and effect."

The intervener, Strong, not having pleaded the execution of this bond by way of estoppel, the only question that arises upon it is as to its effect upon that portion of the claims of libelants accruing after its execution. The libelants were informed by the recitals contained in this bond that Strong was the owner of the steamer, and that Messrs. Crocker & Brooks were in possession of, and were about to operate, the steamer, under a contract to purchase; and if they were not directly informed by such recitals that the vendees were to permit no claim or lien to accrue against the steamer, while in their possession, and until fully paid for by them, they were at least put upon inquiry as to the terms of such contract. The libelants, however, did not inquire as to the terms of the agreement, and, under such circumstances, there is a conclusive presumption that, if inquiry had been made, they would have been fully informed in relation thereto. They are therefore charged with knowledge of the fact that Crocker & Brooks were in possession of said steamer, under an agreement for its purchase, and by the terms of which they had further agreed with the intervener, Strong, that all alterations in, or repairs which they caused to be made to, such steamer, should be paid for by them, and that they were not to permit any liens to accrue against such steamer while it should be in their possession, under that contract.

The rule declared by the supreme court of the United States in the case of The Kate, 164 U. S. 458, 17 Sup. Ct. 135, is really conclusive upon this point. In that case it appeared that the United States & Brazil Mail Steamship Company was in possession and operated the Kate under a charter party, which provided, among other things, that the charterer should provide and pay for all coal used by the steamer during the time it was under such charter. The libelant there, knowing of the existence of the charter, but without actual knowledge of its terms, furnished coal for that steamer, upon the order of the charterer, and, in fact, relied upon the credit both of the charterer and of the vessel. It was held by the supreme court that, under these circumstances, the libelant was not entitled, under the maritime law, to enforce any lien against the Kate; and, in discussing the question, the court said:

"We are of opinion that, as the libelant knew, or under the circumstances is to be charged with knowledge, that the charter party under which the Kate was operated obliged the charterer to provide and pay for all coal needed by that vessel, no lien can be asserted under the maritime law for the value of coal supplied under the order of the charterer, even if it be assumed that the libelant in fact furnished the coal upon the credit both of the charterer and the vessel. As the charterer had agreed to provide and pay for all coal used by the vessel, he had no authority to bind the vessel for supplies furnished to it. His want of authority to charge the vessel for such an expense was known or could have been known to the libelant by the exercise of due diligence on its part. Under the circumstances, the libelant was not entitled to deliver the coal on the credit of the vessel, and its attempt to hold the vessel liable is in bad faith to the owner. The law cannot approve or encourage such an attempt to wrong the owners of the vessel. Neither reason nor public policy forbade the owner and the charterer from making the arrangement evidenced by the charter party of December 15, 1892."

As before stated, some portion of the claim of Whelan & Whelan is for materials furnished and repairs made by them upon the order of the master; what portion, however, does not appear, nor whether such materials were furnished and repairs made before or after the execution of the bond above referred to. If before, it was incumbent upon the libelants to prove the fact, and the value of such materials furnished and repairs made; and, if after its execution, their claim therefor must be held to be subordinate to that of the intervener, Strong, because, as we have seen, they were charged, by the recitals in the bond, with notice of the terms of the contract under which Strong had parted with the possession of the steamer, and such contract was sufficient to put the libelants upon inquiry as to the authority of the master to bind the steamer for materials and repairs while in the possession of Crocker & Brooks, under their contract to purchase; and they made no such inquiry.

There remains for consideration the further question as to the right of the libelants to enforce, as against the intervener, Strong, a prior lien against the steamer for the materials furnished and repairs made by them upon the order of Crocker & Brooks, before the execution of the bond above referred to. In passing upon this question, it is necessary to keep in mind the following facts: That Messrs. Crocker & Brooks had not been authorized by the intervener, Strong, to make such repairs upon the credit of the steamer, and that the libelants made no inquiry whatever as to the ownership of the steamer, or as to the authority of Crocker & Brooks to create a lien against the steamer for such materials and repairs, and such repairs were not necessary for her preservation. In view of these facts, the right of the libelants to maintain a prior lien as against the intervener, Strong, for that part of their claims now under consideration, must depend upon the answer to be given to this question: Were Messrs. Crocker & Brooks clothed by the intervener, Strong, with an ostensible authority to create liens against the steamer, for such alterations and repairs as they might choose to have made? If the possession of the steamer under their agreement to purchase gave to them such ostensible authority, then libelants might safely contract with them in relation to such materials and repairs, relying upon such apparent authority, and without making any further inquiry. If, however, the intervener, Strong, in delivering possession of the steamer to Messrs. Crocker & Brooks under the contract above referred to, did not confer upon them an ostensible authority to bind the steamer for materials and repairs, then the libelants failed to exercise ordinary business prudence in not making some inquiry as to the actual authority of Crocker or Messrs. Crocker & Brooks, in the premises, and their claims must be held subordinate to that of the intervener, Strong.

The question thus presented is, I think, set at rest by the decision of the supreme court of the United States in The Valencia, 165 U. S. 264, 17 Sup. Ct. 323. That was a libel for coal furnished the steamship Valencia for its specific use, and the coal was furnished upon the order of the New York Steamship Company, a corporation, who

operated the steamer under a charter requiring it to provide and pay for all coal. The further facts are thus stated by the court:

"The libelants were not aware of the existence of the charter at the time they furnished the coal, nor did they know where the ship hailed from, whether she was foreign or domestic, nor what was her credit. They were at the time without knowledge of the ownership of the vessel, or of the relations between it and the New York Steamship Company, except that the company 'appeared to be directing its operation.' They made no inquiry as to the solvency of the steamship company, or as to the ownership or nationality of the vessel, but, in the belief that the ship was responsible for the supplies furnished, delivered the coal as above stated, charging the same on its books to 'S. S. Valencia, and owners, New York,' in some cases 'city,' in others 'Pier 49, E. R., New York.' No fact proven in the case warranted the inference that either the master or the charterer agreed to pledge the credit of the vessel for the coal."

In passing upon the right of the libelants in that case to enforce a maritime lien against the Valencia upon that state of facts, the court said:

"Although the libelants were not aware of the existence of the charter party under which the Valencia was employed, it must be assumed upon the facts certified that, by reasonable diligence, they could have ascertained that the New York Steamship Company did not own the vessel, but used it under a charter party providing that the charterer should pay for all needed coal. The libelants knew that the steamship company had an office in the city of New York. They did business with them at that office, and could easily have ascertained the ownership of the vessel, and the relation of the steamship company to the owners. They were put upon inquiry, but they chose to shut their eyes, and make no inquiry touching these matters, or in reference to the solvency or credit of that company. It is true that libelants delivered the coal in the belief that the vessel, whether a foreign or a domestic one, or by whomsoever owned, would be responsible for the value of such coal; but such a belief is not sufficient in itself to give a maritime lien."

The principle thus laid down by the supreme court of the United States, when considered with reference to the particular facts to which it was applied in that case, goes to this extent, in effect: That possession of a vessel under a charter does not confer upon the charterer an apparent authority to create liens against the vessel for supplies; and that a person furnishing supplies to a vessel upon the order of one having no apparent authority to pledge the credit of the vessel is put upon inquiry as to the actual authority of such person so to do. I am unable to discover any reason why a different rule should be applied in this case. The owner who delivers possession of his vessel under an agreement for its sale upon condition is certainly entitled to no less protection against its unauthorized incumbrance than one who parts with possession of his vessel under a charter; and, if in the one case, then in the other, also, the person furnishing repairs, materials, or supplies to the vessel is put upon inquiry as to the authority of the person with whom he deals to pledge the credit of the vessel. Nor does the fact that in this case the materials furnished and repairs made may have enhanced the value of the steamer, and so, in a certain sense, have benefited the owner, change the rule declared in the case just cited. The materials and repairs were not necessary for the preservation of the steamer, although they may have been necessary in order to properly fit and equip her for the business in which she was employed by Messrs. Crocker & Brooks. The repairs were

in fact made for the benefit of Crocker and others interested with him in the purchase and operation of the steamer, and, as he was without actual or apparent authority to pledge the credit of the vessel therefor, the claim of the libelants must be held to be subordinate to that of the intervener, Strong.

4. The Libel of E. J. Loughery: This libel is to recover for services as purser while the steamer was being operated by Crocker & Brooks and others associated with them. The evidence shows clearly that he was employed for this purpose by Messrs. Crocker & Brooks, and I am satisfied from all of the circumstances in evidence that the libelant knew of the terms of the agreement under which they held possession of the steamer. Indeed, the evidence shows that the libelant advanced a portion of the money paid by Crocker & Brooks on account of its purchase at the time the steamer was delivered to them, and that, when this money was advanced, the libelant understood that he was to have some interest in the steamer. The evidence shows that the libelant considered himself a part owner, and that Crocker & Brooks also regarded him as such; and the evidence points to the fact that this understanding was the result of an agreement between them that the libelant was to have an interest, not only in the steamer, but in the business in which she was engaged while he was rendering the services as purser,—in short, that he was a partner in that business. Under these circumstances, I am satisfied that any claim the libelant may have against the steamer or its proceeds for services rendered by him is subordinate to that of the intervener, Strong.

5. Intervention of J. L. Kercheval: The evidence shows that Mr. Kercheval was employed as a traveling agent of the steamer, to solicit patronage along the Sacramento river. His own testimony is to the effect that he solicited trade at one place and another, and sometimes assisted on board when the steamer was making a landing, but he was not employed as one of the crew. I do not think the service this libelant was employed to render is a maritime service, and therefore he is not entitled to enforce a lien against the steamer therefor. The Crystal Stream, 25 Fed. 575; Doolittle v. Knobeloch, 39 Fed. 40.

6. The Intervention of Frank Dalton: This libelant is entitled to recover the full amount claimed by him, less $14, the amount of a hotel bill, including whisky, cigars, and lodgings, furnished certain persons connected with the steamer, but which can hardly be considered as having been furnished upon its credit.

The libels referred to in paragraphs 4 and 5 of this opinion will be dismissed, and the claims of all other libelants will be allowed, with costs, less the amount claimed by any of them for services rendered after September 15, 1897, the date when the steamer was attached and taken into custody by the United States marshal under the process issued upon the libel of the Black Diamond Coal-Mining Company. The claims of Whelan & Whelan and McMurphy & McAvoy are subordinate to that of the intervener, Strong, and that of Strong is subordinate to the claims of all the other libelants. Let such a decree be entered.