## THE OCEANA.

### (District Court, E. D. New York. April 21, 1916.)

1. MARITIME LIENS ⚖══29—LIENS FOR REPAIRS AND SUPPLIES—FEDERAL STATUTE.

Under Act June 23, 1910, c. 373, 36 Stat. 604 (Comp. St. 1913, §§ 7783–7787), one furnishing repairs, supplies, or necessaries to a vessel on order of any person to whom the management by the vessel has been intrusted by the owner in the port of supply is under no duty to inquire as to the authority of such person to bind the ship, and is entitled to a lien, unless something comes to his knowledge to put him on inquiry, in which case his right to a lien is affected by such facts as he knows or by the exercise of reasonable diligence could have ascertained. If he has knowledge that he is dealing with a charterer or an agreed purchaser in possession, he is put upon inquiry as to the terms of the charter or contract of sale and is bound thereby.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 48; Dec. Dig. ⚖══29.]

2. MARITIME LIENS ⚖══30—LIENS FOR REPAIRS AND SUPPLIES—CONSTRUCTIVE NOTICE OF CONTRACT OF SALE.

Under such statute, the filing in a county office under state laws of a contract of conditional sale of a vessel does not operate as constructive notice to one furnishing repairs, supplies, or necessaries to such vessel.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 37, 38; Dec. Dig. ⚖══30.]

3. MARITIME LIENS ⚖══29—LIENS FOR REPAIRS AND SUPPLIES—FEDERAL STATUTE.

While under act June 23, 1910, any person intrusted by the owner with the management of a vessel is presumed to be his agent who may create liens for repairs, supplies, and necessaries, an agreed owner can appoint such an agent only when he is in possession of the ship, either actually or constructively.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 48; Dec. Dig. ⚖══29.]

4. MARITIME LIENS ⚖══31—LIENS FOR REPAIRS AND SUPPLIES—PURCHASES BY PERSONS INTRUSTED WITH MANAGEMENT OF VESSEL.

The owner of a steamship made a contract for its conditional sale, to go into immediate service on its delivery, which was to be as soon as certain preliminaries could be arranged. Within a very few days, and before formal delivery, agents of the purchaser, including the chief steward and commissary, went on board and took actual charge for the purpose of repairing, equipping, and supplying the vessel for sailing. Such agents ordered and received repairs, supplies, and other necessaries with the knowledge of the seller, which also knew that the bills therefor were not paid, but took no steps to notify the persons furnishing the same that they could not look to the vessel for payment. More than a month after delivery, the seller exacted a second payment on the purchase price with knowledge that a large sum was then due and unpaid for such supplies, etc., in violation of the terms of the contract of sale, which required the purchaser to promptly pay all such bills, to keep the vessel free from liens, and to at once procure the release of any liens filed or claimed, and provided that on failure to comply with such requirements the seller might terminate the contract and retake possession. *Held*, that all persons so furnishing repairs, supplies, and other necessaries both before and after formal delivery of the vessel, without knowledge or notice of the contract of sale, were entitled to liens as against the seller which had retaken possession under the contract.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 40; Dec. Dig. ⚖══31.]

⚖══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Consolidated suits to enforce maritime liens against the Steamship Oceana; the Morse Dry Dock Company, claimant. On exceptions to report of special commissioner. Exceptions sustained in part, and case returned for further findings.

Charles F. Kelly, of New York City, for Conron Bros. Co. (1).

Robinson Leech, of New York City, for Maryland Coal & Coke Co. (2) and W. A. Fletcher Co. (3).

Carter & Carter, of New York City, for Campbell & Stewart (4).

Burlingham, Montgomery & Beecher, of New York City, for Samuel E. Hunter (5), Isaac M. Burnap (21), Caleb V. Smith (22), and F. B. Dalzell & Co. (25).

Yankauer & Davidson, of New York City, for J. T. Smith, Inc. (6), Jacques & Co. (50), and Pabst Brewing Co. (51).

Ralph J. M. Bullowa, of New York City, for Kniffen & Demarest Co. (7), James Y. Watkins & Son (8), Suskind & Tilbor (9), Davies & Sullivan (18), First Vienna Bakery (19), Christian J. Jetter (20), Specification Soap & Oil Co. (54), Van Dyck Gravure Co. (55), Albany Baking Powder Co. (61), Hygenia Antiseptic Toothpick Co. (66), and Wendell Towel Supply Co. (67).

Julius Offenbach, of New York City, for A. Silz Inc. (10), John W. Butler, Inc. (11), Blackfords, Inc. (12), Knapp & Van Nostrand (13), and Steinhardt & Kelley (24).

Foley & Martin, of New York City, for Andrew Mills & Son (14), W. S. Pendleton, Jr. (15), and Columbian Rope Co. (16).

J. Chester Johnson, of Brooklyn, N. Y., for John Wanamaker (17).

Spitz & Bromberger, of New York City, for Beech Nut Packing Co. (23).

Arnon L. Squiers, of New York City, for John L. Bliss (26).

Harrington, Bigham & Englar, of New York City, for R. F. Downing & Co. (27).

Edward Ward McMahon, of New York City, for Hunter & Trimm (28) and William M. Schwenker (29).

Rollins & Rollins, of New York City, for Cornell & Underhill (30).

Edgar R. Mead, of New York City, for M. K. Bowman-Edson Co. (31).

MacFarland, Taylor & Costello, of New York City, for McQuade Stevedoring Co. (32).

Henry W. Goodrich, of New York City, for R. G. Williams & Co. (33).

Louis Halle, of New York City, for E. S. Alpaugh & Co. (34).

Samuel Bernstein, of New York City, for Crandall Packing Co. (35).

Elfers & Abberley, of New York City, for Charles R. Nolte (36).

House, Grossman & Vorhaus, of New York City, for J. J. Eager Co. (37).

Carpenter & Park, of New York City, for W. Brewer (38), W. Huus (39), H. A. Miller (40), E. C. Winters (41), F. W. Miller (42), J. W. Sullivan (43), J. J. Adler (44), J. E. J. Kiernan (45), F. Hopkins (46), W. Earle (47), J. W. Ackerman (48), and W. A. Mitchell (49).

James W. Prendergast, of New York City, for F. W. Devoe & C. T. Raynolds Co. (52).

Blumenstiel & Blumenstiel, of New York City, for Anheuser Busch Agency (53).

Alexander & Ash, of New York City, for Frank W. McKee (56), Burns Bros. (57), and Mutual Steam Laundry Co. (58).

Greene, Hurd & Stowell, of New York City, for Western Electric Co. (59).

Samuel D. Jones, of New York City, for Francis H. Leggett & Co. (60).

Oscar A. Campbell, of New York City, for Liquid Carbonic Co. (62).

Henry A. Blumenthal, of New York City, for H. C. Reese Co. (63).

Abbott & Coyne, of New York City, for Gilbert & Morse (64).

Herman Goldman, of New York City, for New York Belting & Packing Co. (65).

VanIderstine, Duncan & Barker, of New York City, for Kroeschell Ice Mach. Co. (68).

E. G. Budington, of New York City, for A. B. Sands & Son Co. (69).

Armstrong, Brown & Purdy, of New York City (Pierre M. Brown and Wm. F. Purdy, both of New York City, of counsel), for claimant.

VEEDER, District Judge. This is a consolidated action embracing 69 libels asserting maritime liens aggregating $43,289.93 against the steamship Oceana, of which the Morse Dry Dock & Repair Company appears as claimant. For convenience of reference the number given each lien claim in the special commissioner's report is added to the lienor's name in the list of appearances of counsel, and the various lienors are hereafter referred to by number. All the claims are for repairs, supplies, or other necessaries, within the meaning of the Act of June 23, 1910 (36 Stat. 604), relating to liens on vessels, save (3), which is in part for two booms and for repairing and carting a coal chute; (25), which is for towage; (27), which is for brokerage and tonnage dues and fees; (32), which is for stevedoring; and (38 to 49), inclusive, which are for pilotage. The consolidated action was referred to James K. Symmers, Esq., as special commissioner. His report was duly filed, and now comes before the court upon exceptions filed by the claimant and by various libelants. The issues with respect to the claims for repairs, supplies, or other necessaries are confined substantially to the construction and application of the act of Congress of June 23, 1910. The special commissioner allows in full 21 of the claims for repairs, supplies, or other necessaries, aggregating $11,698.36, viz., Nos. (1), (4), (9), (11), (12), (16), (18), (19), (20), (21), (28), (29), (30), (31), (33), (34), (55), (57), (58), (64), and (69). He allows in part 25 of such claims aggregating $21,459.12, to the extent of $10,681.46, viz., Nos. (2), (3), (5), (6), (8), (10), (13), (14), (15), (17), (22), (23), (24), (37), (50), (51), (52), (53), (54), (59), (60), (62), (63), (65), and (66). That is to say, he disallows all repairs and supplies ordered or delivered to the vessel prior to the

date upon which he finds that the vessel was formally delivered to the purchaser under an agreement theretofore executed. He disallows in full eight of such claims, aggregating $6,934.28, viz., Nos. (7), (26), (35), (36), (56), (61), (67), and (68), on the ground either that the supplies were ordered or delivered prior to the date of formal delivery of the vessel, or that the libelants were put upon inquiry concerning the authority of the agreed purchaser to bind the vessel. With respect to the claims for liens other than for repairs and supplies he disallows all, that is, (3 in part), (25), (27), and (32), save the claims for pilotage, (38–49) which are allowed. The commissioner also found, at the claimant's request, that the Oceana had her port of registry, New York, painted on her stern; that inquiry, even by telephone, of the proper officials of the New York Custom House, would have disclosed that the Morse Company was the registered owner of the Oceana; that such inquiry of the Morse Company, at either its Brooklyn or Manhattan office, would have elicited correct information concerning the title to the vessel and the provisions of the conditional bill of sale relating to liens; and that inquiry of the master of the vessel would have resulted in the ascertainment of the situation, or at least enough to necessitate further inquiry. The claimant has filed exceptions to every allowance made by the special commissioner, save only in the case of pilotage (38–49). Of the eight libelants whose claims for repairs, supplies, or other necessaries were disallowed in full, only five have filed exceptions, viz., (7), (36), (56), (61), and (67). Of the twenty-five libelants whose claims for repairs or supplies were disallowed in part, only sixteen have filed exceptions, viz., (2), (3), (5), (8), (14), (15), (17), (22), (37), (52), (54), (59), (60), (63), (65), and (66). All the libelants asserting liens other than for repairs and supplies have filed exceptions.

As appears by a bill of sale filed in the office of the collector of customs at the port of New York the Oceana was purchased at marshal's sale March 13, 1914, by the Morse Dry Dock & Repair Company, a New York corporation having its principal place of business in the borough of Brooklyn. On December 5, 1914, while the vessel was lying at its yard at the foot of Fifty-Sixth street, Brooklyn, the Morse Company contracted with the Bermuda-American Steamship Company, Limited, a Bermuda corporation, for her sale for $255,000 upon conditions set forth in the contract. The purchase price was to be paid, $30,000 on account on the date of execution of the contract, the balance in monthly installments of $25,000 each on February 1st, March 1st, and thereafter as specified. Title to the vessel was to remain in the Morse Company until the entire purchase price was paid. The contract further provided that before delivery the purchaser should deliver to the seller certain insurance policies; also, that at the time of delivery the steamer should hold British Lloyds A-1 classification and inspection required for United States registry. The seller was required to provide before delivery certain specified equipment. It was further stipulated that the vessel should be delivered to and accepted by the purchaser not later than December 19th; that in the event of any contingency arising, not with-

in the control of the seller, which should prevent delivery of the vessel on that date, the seller should not be liable for damages for such delay, but in case of delay for more than 14 days thereafter the purchaser should have the option to cancel the contract, and the bill of sale (which the contract provided should meanwhile be executed contemporaneously therewith and delivered to the Columbia Trust Company in escrow) was, in the event that the purchaser exercised such option, to be returned to the seller, and the installment paid on the purchase price was to be repaid to the purchaser. Upon compliance with the terms of the contract, the bill of sale was to be delivered to the purchaser or its assigns. The purchaser was given the right to organize an American corporation to take title to the vessel, and in that event, at the purchaser's option, the bill of sale was to be made to the American corporation, which should, however, be equally bound with the purchaser by all the terms and conditions of the contract. Until the ship should be fully paid for the purchaser covenanted, among other things:

"(a) To keep said ship clear of any liens from any cause, and if any lien or libel is filed or asserted the same shall be immediately bonded by the purchaser. The purchaser agrees to promptly pay current bills, for supplies and repairs to said ship and exhibit at reasonable times the ship's accounts and bills to seller's representatives.

"(b) To keep said ship and equipment in good repair."

Pursuant to this agreement, the purchaser paid $30,000 down, and the seller executed an absolute bill of sale of the vessel, which, together with a duplicate copy of the agreement, was deposited in escrow with the Columbia Trust Company. On December 9th the contract was filed in the office of the register of the county of Kings. At the same time it was offered for filing in the register's office of the county of New York, but was rejected because the vessel was not in that county. Counsel for the Morse Company at the same time sought to file the contract, or a copy thereof, for record in the office of the collector of customs of the port of New York, but it was refused for record on the alleged ground no law authorized the filing there of such an instrument.

In order to operate the Oceana under American registry, the Bermuda Company caused to be organized a New York corporation called the Bermuda-American Steamship Company of New York. C. V. Frith, who was a director in both companies, was president of the Bermuda Company. C. W. Morse was president of the New York Company. Crosby, one of the directors of the company, then or formerly purchasing agent of the Hudson Navigation Company, in which C. W. Morse was also interested, was employed as purchasing agent, and the purchaser went forward with its preparations to operate the Oceana in the Bermuda trade. Almost all the repairs and supplies thereafter furnished and here involved were ordered for the Oceana by Crosby, with whom many of the libelants had dealt as purchasing agent under his former employment. In most instances the libelants made no further inquiries; those who did were assured by Crosby that the ship was responsible. Most of the bills for supplies were made to the Oceana, either alone or with the addition of

"owners" or "Bermuda-American Steamship Company"; in a few instances they were directed to the company alone. The Bermuda-American Company began at once to advertise extensively its operation of the Oceana in the Bermuda trade. About December 10th, Saunders, the chief steward and commissary, went aboard and took charge. He gives the date variously as the 8th, 10th, 14th, and 15th. But he does say unequivocally that he "was there all the time from the 10th," "fitting out the whole ship." He made up a list of supplies required and discussed it with Crosby and the Morses. He had 35 men at work on board. Coal had been ordered almost immediately upon the execution of the contract. Soap was ordered on December 9th, and paint and varnish at about the same time. On December 14th requisition blanks, order books, etc., were purchased. Arrangements were made on December 15th for supplying the crew with linen coats, and other supplies were ordered on the same day. Certain fittings of the vessel were removed by the purchaser on December 16th for replating. The captain, engaged by the purchaser, went aboard early in December. The crew were aboard and were measured for uniforms between December 15th and 20th. Capt. Pendlebury signed a receipt for a delivery on the 16th, and all were delivered on board before the vessel left the claimant's yard. Cleaners removed blankets and returned them on December 18th. An order was given to the ship chandler on the 19th. Wanamaker's representative went aboard and measured for bed spreads on December 20th. Certain steam packing, which had been ordered theretofore by the chief engineer, was put aboard on December 22d. Various other supplies were ordered and delivered to the vessel between the 22d and the 24th. The Oceana left the claimant's yard on December 25th for Pier 32, North River, from which she was to sail. She sailed on her first voyage on the 26th.

E. P. Morse, treasurer and general manager of the claimant company, was often aboard the Oceana while she was in the claimant's yard, and saw deliveries made on board, and was fully informed. He says he asked to see the purchaser's accounts within a week after the vessel began to run. He knew early in January that the purchaser owed $10,000 in bills; the latter part of the month he was told by C. W. Morse that the amount was $25,000. About the middle of January (or on January 24th), knowing that liens were being created, he sent auditors to examine the purchaser's books. The auditors were told that the books had not been written up, and access to the purchaser's accounts was only obtained upon threats to seize the vessel. The auditors reported informally on January 30th that there were bills against the ship of $30,000. The auditors' formal report, dated January 26th, and received by the claimant on February 1st, disclosed bills payable by the purchaser amounting to more than $38,000. The claimant, through E. P. Morse, at once began negotiations with C. W. Morse about the payment of these bills, but neither then nor at any other time did the claimant communicate with the supply men. The purchaser's first installment of $25,000 on the purchase price due February 1st was paid under pressure on February 8th. Through Capt. Pendlebury, who had formerly been in the claimant's employ,

E. P. Morse knew that the vessel was not carrying half her capacity; and he forced payment of insurance premiums just before the vessel sailed on her last trip at the end of February by threats of seizure. The second installment of the purchase price due March 1st not having been paid, the claimant demanded the bill of sale of the Columbia Trust Company, and on March 8th, upon the Oceana's return from Bermuda, took possession in accordance with the terms of the contract.

[1] The issue raised by the claimant's exception to all the allowances appears in the following extract from the special commissioner's report:

"Claimant contends that the various libelants were obliged to make inquiry as to the ownership of the Oceana. As will be seen, some of them did make such inquiry of the agents of the agreed purchaser in possession, and were misled. But claimant says this was not due diligence, and that the inquiry should have been made at the custom house, where the legal ownership was a matter of record. Claimant very ably contends that Congress did not intend to alter the law stated by the Supreme Court in the case of the Valencia, and that the supply men who failed to make any inquiry and 'shut their eyes' as to the ownership of the vessel should be denied liens. Were the question one which I felt free to consider as open to a commissioner, I should hesitate before deciding otherwise, but the federal lien act has already been so frequently interpreted by the courts as to show a marked trend of judicial opinion to the effect that Congress intended to say and has said in effect that a supply man may furnish necessaries to a vessel on the order of the owner, or of any one intrusted by the owner with the management of the vessel at the port of supply, and, unless something is brought to his attention which would suggest the duty of inquiry, he may presume that he has a lien for the necessaries so furnished. If the supply man have notice that he is dealing with a charterer or agreed purchaser in possession, then he is obliged to inquire as to the authority of the person with whom he is dealing to confer a lien (The Eureka [D. C.] 209 Fed. 373), and, in the absence of inquiry, it will be conclusively presumed that, if inquiry had been made, the facts would have been ascertained (The H. C. Grady [D. C.] 87 Fed. 237). This is the purpose of the proviso in the third section of the act to the effect that nothing in the act shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that, because of the terms of a charter party, or agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor. But the lawful possession and management of a vessel at the port of supply create a presumption of the right to bind the vessel for supplies there furnished. To defeat the lien it must appear that something has been brought to the attention of the supply man which put him upon inquiry as to the right of the person in possession of and operating the vessel to bind her for repairs, supplies, or other necessaries. The Thomas W. Rogers [D. C.] 197 Fed. 772, affirmed 207 Fed. 69 [124 C. C. A. 629]; The City of Milford [D. C.] 199 Fed. 956; The Iola [D. C.] 189 Fed. 979; The Ha Ha [D. C.] 195 Fed. 1013; N. Y. Trust Co. v. Bermuda, etc., Co. [D. C.] 211 Fed. 989."

I agree with the special commissioner's conclusion, without hesitation. The purpose of the act was to remove by a plain and simple course of procedure the confusion into which the subject had become involved. Therefore it did away with the artificial distinction between foreign and domestic vessels; it removed the presumption of credit to the owner; it superseded the state statutes conferring liens for necessaries; and it resolved the conflict of authority over the distinction between charterers and agreed purchasers in possession. Accordingly, the act gives a lien when supplies are furnished to a vessel upon the

order of the owner or of any one authorized by him. It specifies that any person to whom the management of the vessel at the port of supply shall have been intrusted shall be presumed to have been so authorized. . If the materialman knows nothing about the authority of the person in possession of the ship, except that he is managing it, he may furnish the supplies, and the ship will be bound for them. But he may know more. Consequently the proviso. But before this proviso can have any application something must have occurred to put the furnisher of the supplies upon inquiry. As Judge Rose pointed out in The City of Milford (D. C.) 199 Fed. 956:

"It is to be understood in such sense as will harmonize it with the general purpose of the act. That purpose was to make the management of a vessel at its port of supply presumptive evidence of the right to bind it for supplies there furnished. That purpose prevails unless it shall be shown that the person so managing the vessel was unlawfully or tortiously in possession or charge of it, or unless something has been brought to the knowledge or attention of the person furnishing the supplies which in honesty and good conscience puts upon him the duty of inquiry as to whether the person who has the management of the ship has the right to pledge its credit."

The act does not mean that the furnisher shall not have the right to rely upon the authority to bind the vessel presumed to exist in the officers and agents specified in the second section. It is only when he knows that such officers or agents do not have the requisite authority, or under the circumstances is put upon inquiry as to their powers, that the presumption becomes inoperative. There must be an actual restriction of authority by the owner in the first place, and in the absence of affirmative knowledge of such restriction, or of circumstances which ought to raise a doubt in his mind, the furnisher is entitled to rely upon the presumption and will acquire a lien, even if the officer or agent in fact has no authority. The phrase, "knew, or by the exercise of reasonable diligence could have ascertained," was adopted from The Kate, 164 U. S. 470, 17 Sup. Ct. 135, 41 L. Ed. 512, and was used in the act of Congress to make it clear that, if the furnisher know of the existence of a charter party or of an agreement for the sale of the vessel, he is put upon inquiry as to its terms, and cannot excuse himself by denying ignorance of the terms, should it turn out that the charterer or agreed purchaser had undertaken to furnish the vessel at his own cost.

[2] There was, of course, no constructive notice by virtue of the filing of the contract of conditional sale in conformity with the state statute. The act of June 23, 1910, expressly supersedes state statutes conferring liens on vessels, and under Rev. St. § 4192 (Comp. St. 1913, § 7778), there is no constructive notice to anybody unless the bill of sale or conveyance is recorded in the office of the collector of the customs where such vessel is registered or enrolled. Since this conveyance was not so recorded, we have to deal, under the proviso of the third section of the act, not with constructive but with actual knowledge on the part of lienors, or the actual bringing to their attention of some circumstances that would naturally put them upon inquiry.

Turning now to the issues raised by exceptions filed by various lienors, it is contended, in the first place, that the contract provision upon

which the claimant relies fails to show that the purchaser was "without authority to bind the vessel" for necessaries. The libelants' argument that the covenant in question is a mere personal covenant between the parties to the contract, and as such not binding upon the libelants, is obviously untenable. The only way in which a limitation of authority can be imposed under such circumstances is by a provision of the contract. But it is argued, further, that the covenant by its terms does not purport to withhold authority to bind the vessel. It is simply an agreement on the part of the purchaser to pay all bills promptly in order to protect the interest of the vendor under the terms of the conditional sale. The agreed purchaser is not deprived of authority to bind the vessel by reason of the fact that he is obligated to pay for supplies. The requirement that if any lien is filed it shall be immediately bonded is an implied admission that the credit of the vessel may be pledged. Attention is called to the use of the term "ship's accounts and bills" in the covenant, and it is pointed out that this is the construction put upon the covenant by the claimant in practice. E. P. Morse testified that he considered payment within 30 days "prompt payment" as required by the contract. Hence, although he protested against the purchaser's default in payment of bills, upon the purchaser's promise to pay them he was advised by his counsel that the claimant could not take back the vessel as for a breach of the contract. In other words, the incurring of bills against the ship was not regarded as a breach. This, too, apart from the fact that such advice from counsel was given on February 8th, after the first installment on the purchase price was extracted from the purchaser by threats of seizure, and when many of the ship's accounts now in suit were, to Morse's knowledge (through his auditors' report), more than 30 days past due. The contract provision in question seems to me to have been drawn with a view to providing against just such emergencies as arose. While the claimant could bind the purchaser by contractual obligation, it could not in reality deprive the purchaser of power to bind the vessel for supplies. If the purchaser did not pay for supplies furnished, the materialman furnishing them in good faith could assert a lien against the vessel by virtue of the statute, whatever the contract might say. In other words, it was clearly within the contemplation of the parties that liens might be incurred, but that in such event the purchaser would procure their discharge. I am of opinion, however, that notice of the contract would suffice to put persons dealing with the vessel upon inquiry.

An issue of more serious import arises out of the lienors' exception to the conclusion reached by the special commissioner that the Oceana did not actually pass into possession and under the management of the purchaser until December 25th, in consequence of which all necessaries ordered prior to that date were disallowed. The special commissioner's report on this branch of the case is substantially this: While the New York company, of which Crosby was the purchasing agent, may be considered the agent of the Bermuda company, the agreed purchaser, prior to December 25th, neither Crosby nor the New York company was such an agent, to wit, an agent "appointed by an agreed purchaser in possession of the vessel," as by the terms

of the statute might be presumed to have authority to bind the vessel. The statute gives the lien when the supplies have been ordered by "any person to whom the management of the vessel at the port of supply is intrusted," or rather such person is presumed to have authority from the owner to procure supplies for the vessel. The word "management" is used in the act in its primary sense of physical or manual control. Congress intended to make the basis of the presumptive authority from the owner such visible control in some authorized person as would probably influence materialmen to the opinion that they were dealing with one having authority over the vessel. The special commissioner points out that the terms of the contract (clauses 3, 4, 9, and 10) requiring certain things to be done in advance by both parties constituted a postponed delivery, and he finds that the vessel was not delivered into the purchaser's possession until she left the claimant's yard on December 25th.

[3] I am unable to agree with this ruling by the special commissioner. It is unfortunate that section 2 of the Lien Act employs the terms "managing owner, ship's husband, master or any person to whom the management of the vessel is intrusted," to enumerate the functionaries who are readily reducible to and are described in section 3 as "officers and agents." It is clear, however, that under the act any person to whom an owner intrusts the management of his ship may create liens, but that an agreed purchaser of a ship can only appoint such an agent when he is in possession of the ship. Where there is nothing to limit the term, possession may be either actual or constructive; and I incline to the opinion that it is so employed in this act. From this point of view, and with respect to the matter of supplies and equipment here involved, it would be quite in accord with the evidence to regard the vessel as having been legally in the possession of the vendee from the date of the first payment on the purchase price. That is, possession might well be construed to mean the intended right to enjoy the property.

[4] But it is sufficient for the purpose of this case to decide that even upon the principle of visible control in some authorized person, which the special commissioner adopts as his guide, the evidence shows that the agreed purchaser was in possession of the vessel as early as December 10th, when the chief steward came aboard and took charge. The commissioner has expressly found that no ulterior significance is to be attached to the fact that the vessel was in the claimant's yard, inasmuch as the claimant was well known to be a repair, not an operating, company. The purchase was known to have been made for immediate use of the vessel in the Bermuda trade. To insure operation it was obviously the purpose of the contracting parties that the purchaser should be empowered to do everything necessary to prepare the vessel for operation, and the purchaser was intrusted with her management for the attainment of that object. The various acts of the purchaser from December 10th, which have been set forth in the statement of facts, were acts of possession. They were the acts necessary on the part of a purchaser coming into possession to put the thing to use. Having regard to the situation which existed from the 10th to the 25th of December, who save the agreed purchaser was in

apparent possession and management of this vessel? Certainly not the claimant. The only person on board who could be said to represent it was the chief engineer, who, by the terms of the contract of sale, was appointed by the seller until a certain amount of the purchase price was paid. But the persons visibly in possession and management during this period were the agents of the agreed purchaser, beginning with Crosby, the purchasing agent, and Saunders, the chief steward and commissary. Crosby ordered the supplies, and Saunders received them on board, checked them up, and receipted for them. This was the usual procedure, and they were the customary agents through which and by whom shipowners purchased supplies, and the supply men, dealing with them in the ordinary course of business, were justified in believing them to be what they usually were and then appeared to be.

The claimant's course of conduct in the premises is a consideration which should not be overlooked. All the cases dwell upon the importance of good faith. The proviso of the act is designed to protect the owner only if he has tried to protect himself. New York Trust Co. v. Bermuda-Atlantic Steamship Co. (D. C.) 211 Fed. 989. The conduct of the complainant may be such as to convey the implication that he consents. The Thomas W. Rogers (D. C.) 197 Fed. 772; Id., 207 Fed. 69, 124 C. C. A. 629. Here the seller had not only clothed the purchaser with the insignia of possession and management, but, with knowledge of what was transpiring, had permitted the agreed purchaser to hold itself out as having possession and management. Although E. P. Morse knew early in January that there were bills against the ship for supplies to the extent of $10,000, and by February 1st had all the details of indebtedness aggregating $38,000, neither he nor anybody else on the claimant's behalf took any steps to warn people who had furnished and were continuing to furnish supplies to the ship that they could not look to the credit of the vessel. He says the purchaser assured him that the bills were being paid. But he knew that they were not. The only inference to be drawn from the evidence is that the claimant's policy was to keep the vessel running in order to produce the revenue from which the installment payments due under the contract could be secured. When the first installment, due February 1st, was finally paid on the 8th upon threats of seizure, the claimant was content to accept the purchaser's stale assurance that the outstanding supply bills amounting to more than $38,000 would be paid; and it was only because the purchaser failed to make the second payment on the purchase price that the claimant on March 8th took possession of the vessel. Yet the contract provided that in case of breach of any of its covenants the seller should have the right to take possession of the vessel immediately. The first express covenant required the purchaser to pay promptly current bills for supplies and repairs, and to exhibit the ship's accounts and bills to the seller. Even the claimant's excuse that prompt payment meant 30 days' time is no justification, for, although the auditors' report received by the claimant on February 1st does not state when the bills therein listed accrued, the auditors had the bills before them, and that information, if not

chargeable to the claimant, was at least available to it; indeed, in some instances was actually known by it. Creditors were lulled into security, instead of being warned. The purchaser used the income from operation to pay the claimant, while the supply men who made operation possible were put off with promises.

Other exceptions to the special commissioner's report are overruled. The report is accordingly confirmed; save in so far as it disallows a lien for repairs, supplies, or other necessaries furnished prior to December 25, 1914, in which respect it is disapproved, and a lien is allowed for all necessaries furnished on and after December 10, 1914, irrespective of the date of the order. Accordingly, the account of all libelants who have filed exceptions to the disallowance of a lien for their account, in whole or in part, on that ground, namely, (2), (3), (5), (8), (14), (15), (17), (22), (37), (52), (54), (56), (59), (60), (61), (63), (65), (66), and (67), will be restated by the special commissioner, to whom the case is returned for that purpose.