### THE ANGIE B. WATSON.

(District Court, D. Massachusetts. June 15, 1921.)

No. 1954.

Maritime liens ☞28—Lien for supplies furnished on order of master.

A fishing schooner *held* subject to a lien for food supplies furnished on order of her master in a port where she was not known, though he was operating her on a lay and had no authority to bind her, where it did not appear that it was customary to let vessels on the lay on that part of the coast, and libelant relied on the master's apparent authority.

In Admiralty. Suit by William C. Scott against the schooner Angie B. Watson. Decree for libelant.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Miles Wambaugh and Blodgett, Jones, Burnham & Bingham, all of Boston, Mass., for libelant.

Sylvester M. Whalen, of Boston, Mass., for claimant.

MORTON, District Judge. This is a libel for supplies of food delivered on board the schooner Angie B. Watson upon order of her master in the port of Newport, R. I., in March and April, 1919. It is admitted that the supplies were furnished as claimed in the libel and that the prices stated are reasonable. The controversy is as to whether the vessel is liable for them.

The Angie B. Watson is a Gloucester fishing vessel. At the time in question she had been let by her owners to one Trott as master on the one-fifth lay, and was engaged in mackerel fishing. She put into Newport with a fare, and while there Trott made the purchases in question. At the time of making them he was asked by Henry T. Scott (manager for the libelant), "Who would pay for them?" and replied that the agents of the vessel, Wollard & Brewster of Boston, would do so. In fact, the schooner being on the one-fifth lay, the owners were not liable for supplies, as Trott well knew, and his statement appears to have been unauthorized and fraudulent. The testimony is that he absconded with the entire receipts for the trip. Henry T. Scott had never heard that fishing vessels were sailed on lays, and knew nothing about the customary terms of lays.

The parties agree that Trott was not in fact authorized to pledge the credit of the vessel, or to bind her owners for these goods. Under the statute, however (Act June 23, 1910, 36 Stat. 604 [Comp. St. §§ 7783–7787]), he had presumptive authority to do so, and the vessel is liable, unless the person furnishing them—

"knew, or by the exercise of reasonable diligence could have ascertained, that * * * the person ordering the * * * supplies * * * was without authority to bind the vessel therefor." Section 3 (section 7785).

The question, then, is whether Scott, by the exercise of reasonable diligence, could have ascertained Trott's lack of authority. There was nothing which would put him on inquiry, except the fact that the Watson was a fishing vessel. See The Oceana (D. C.) 233 Fed. 139. In the waters of Massachusetts Bay, and probably on the Maine coast as well, it is so customary to operate such vessels on a lay that I should have no hesitation in holding that anybody furnishing supplies to them was bound to take notice of that fact. The Acushla (D. C.) 260 Fed. 419.

There is, however, no evidence of any such custom in the Rhode Island waters, nor, indeed, on the south coast of New England. In the New Bedford whaling ships it was customary to pay the crew by a lay, but the vessels themselves were operated by the owners. Scott has, for more than 20 years, been furnishing supplies to all sorts of vessels, including fishing vessels; he customarily charged all supplies to the vessels, making no distinction between fishermen and merchantmen. It is possible that he knew of the custom which prevails in Boston and Gloucester as to sailing on a lay; but there is nothing in the evidence

from which that fact can fairly be inferred. See The Yankee, 233 Fed. 919, 147 C. C. A. 593.

Upon all the evidence, I am not satisfied either that Scott knew, or, by such diligence as he was bound to exercise, could have ascertained, that Trott was not authorized to bind the vessel and her owners for these supplies.

The lien was not lost, either by the sale of the vessel or the delay in filing the libel. She was sold in December, 1919. The owner knew of Scott's claim and warranted her free of liens. She did not return to Newport; and Scott endeavored, not very energetically perhaps, to locate her, and did not learn her whereabouts until the early spring of 1921, when he promptly brought this libel. The purchaser will not suffer by the allowance of Scott's lien. See The Tonawanda (D. C.) 27 Fed. 575. In view of the death of the libelant, an amendment bringing in his representative may be necessary.

Let there be a decree for the libelant for the amount of the bill, with interest and costs.