**CUTTYHUNK BOAT LINES,**
Inc. et al.

v.

**THE PENDLETON.**

No. 52–30.

United States District Court,
D. Massachusetts.

Dec. 17, 1953.

John O. Parker, William T. Conlan, Ely, Bartlett, Thompson & Brown, Boston, Mass., George P. Ponte, New Bedford, Mass., for libellants.

Thomas H. Walsh, Leo Glynn, Boston, Mass., Wilbur E. Dow, Jr., New York City, for Zenith S. S. Co.

Solomon Rosenberg, New Bedford, Mass., for intervening petitioners Max Chapman and Raymond Davis.

Charles S. Bolster, Seymour P. Edgerton, Bingham, Dana & Gould, Boston,

Mass., for claimant Esso Standard Oil Co.

Joseph F. Dolan, Boston, Mass., for National Bulk Carriers Inc., amicus curiae.

Gifford D. Warner, pro se, Essex, Conn.

WYZANSKI, District Judge.

On deposit in the Registry of this Court is $31,765.59 representing the net proceeds of the sale of the bow of the M. V. Pendleton and $2,456.83 representing the balance of the net proceeds of the cargo. The latter, by stipulation, is to be awarded to the salvors, if any there be. Issue is raised as to how these proceeds shall be distributed. And the matter now comes before me, on exceptions filed to the report of Commissioner Brown. Responding to suggestions in my order of June 24, 1953, all parties have agreed that this Court instead of technically proceeding to consider the Commissioner's report and exceptions thereto shall "proceed to examine the record [of testimony before the Commissioner] and on the basis of that record make its own findings and conclusions."

On the evidence taken by the Commissioner, the Court finds these to be the dominant facts.

February 15, 1952, a severe storm broke in two The Pendleton, an oil tanker, carrying petroleum owned by Esso. The vessel was registered in the name of National Bulk Carriers, Inc. March 7, National wired the Chief of the United States Army Engineers "* * * we * * * abandoned * * * [the bow section of the vessel] to U. S. Army Engineers for destruction or disposal." March 11, Colonel Milne acknowledged receipt of the telegram. March 21, Whitcomb, Chief of Operations Division, requested National to supply further information "in order that full abandonment may be established." March 31, National wired the Office of the Chief of Engineers that "we herewith withdraw and cancel offer abandonment." April 1 that office replied, "cancellation of abandonment * * * received and accepted."

National was also at various times in communication with its insurers. But these inconclusive communications did not reveal any final intention of abandonment by National.

April 2 National sold the bow (not the cargo) "as is, where is" to Zenith Steamship Corporation. The same day Zenith began salvage operations. Difficulties led the responsible Zenith officials to suspend operations until oil barges would be available to buoy the bow—a date expected to occur in June or July. Accordingly by April 19, Zenith set the bow in the sand, and withdrew all equipment and men, but continued from a distance to keep an eye on the ship. No representative of Zenith ever intended to abandon the bow. On the contrary, the clear purpose of that company's officials was to await better working conditions and to seek a favorable market for disposal of the property.

From the time of the original accident on February 15 the wreck was never a serious obstruction or danger to other craft, even in foggy weather. The risk of the bow splitting was slight. Such damage as was reasonably foreseeable related only to the value of the bow itself and its contents and that was a minimal possibility.

One Gifford D. Warner in March removed oil from the bow. In April Zenith, looking for a prospective purchaser, gave Warner permission to board the vessel solely for inspection purposes. In May and June Warner on his own responsibility engaged in some pumping and other operations which he regarded as salvage efforts. Because of personal injuries, he desisted on June 18.

In addition to Warner, others who engaged in what they regarded as salvage efforts were a group sometimes called the joint venturers—Cuttyhunk Boat Lines, Inc., its sole stockholder, Captain Crawford W. Fleming, its employee, Max E. Chapman, and its associates, Ernest W. Flood, Clarence Flores, Raymond Davis, and Cyrus Cormier. Zenith

never gave any of these persons permission to do more than make soundings around the vessel. Nonetheless, the joint venturers, or some of them, on June 22 floated the bow, and on June 23 reported this to Zenith and informed it that they needed a larger tug to tow the bow to port. There were abortive efforts by some of the joint venturers to agree with Zenith as to how much it would pay for their services if the bow were brought to a port satisfactory to Zenith. At the end of June some of the joint venturers succeeded in bringing the bow into port at New Bedford. Subsequently it was sold by the order of this Court, and the net proceeds are now in its registry.

Upon the facts, the following are this Court's conclusions of law.

██ National never abandoned the bow. It made a tender phrased in terms of abandonment but as a matter of law amounting to an offer of assignment to the Army, which the Army did not accept, and which National withdrew. National did not either in its immediate communication with its insurers or in any other way effectively abandon or express an intention to abandon the bow.

██ National's transfer of its title to Zenith was effective. Zenith did not abandon, nor intend to abandon the bow of The Pendleton. When Zenith suspended operations in April, it left the bow in a situation where it was not an appreciable menace to navigation. The passage of time between April and July has no legal significance, for Zenith far from abandoning or intending to abandon the bow was merely awaiting favorable weather, equipment, and market conditions. And no one was adversely affected by the delay.

██ There having been no appreciable marine peril, both Warner and the joint venturers were mere gratuitous intermeddlers not salvors. For their officiousness they are not entitled to compensation of any sort. Their so-called contributions were not required, requested, or remunerable. And their success does not warrant any inference that the vessel was a derelict of such nature as to warrant their recovery of any of their expenses or of any award for their efforts.

██ The proceeds of the hull are awarded to Zenith. The balance of the proceeds of the cargo cannot go to salvors because there are none. In default of other claims, and in view of the fact that neither National nor Zenith ever had title to the oil, the balance of the proceeds of the cargo go, as did the first part, to the original owner Esso.

Both awards are subject to the fee due the court reporters for the copy of the record they supplied to the Commissioner, for both grantees of the award benefitted from the hearing, and their payments to the reporter should be in proportion to the awards.

Decree according to the last two paragraphs.