Oswald L. **BONIFAY** and Wayne P. Le Van, partners t/a Maritime Salvage Associates, Libellants,

v.

**THE** Steamship **PARAPORTI**, in rem, Respondents.

No. 7776.

United States District Court
E. D. Virginia, Norfolk Division.

July 25, 1956.

John W. Oast, Jr., Norfolk, Va., for libellants.

Seawell, Johnston, McCoy & Winston, Norfolk, Va., for respondents.

HOFFMAN, District Judge.

On April 11, 1956, the Costa Rican Steamship Paraporti ran aground in the vicinity of Lynnhaven Inlet in Princess Anne County, Virginia, during a violent northeast storm. In effect, the vessel was beached with its port side flush with the sand bathing beach. Despite efforts to float the ship, she remains in approximately the same location although her stern has angled out to sea with the bow

remaining firmly embedded in the sand and clay beach.

The libellants and owners of the Paraporti entered into a written contract on May 1, 1956, wherein salvage arrangements were agreed upon on a "no-cure, no-pay" basis with the maximum compensation of $65,000 conditioned that libellants were successful in removing the vessel and towing her to a repair yard. The time limitation as set forth in the contract was twice extended by mutual agreement, with the contract and both extensions expiring on June 14, 1956, at 10:00 a. m. As heretofore noted, the Paraporti has not yet been freed and there is no contention that libellants are entitled to any compensation for their services performed prior to June 14, 1956. That libellants incurred considerable financial liability and expended large sums of money prior to that date is not to be doubted, but they were fully aware of the terms of said contract and cannot now be heard to complain. It further appears that E. V. Williams Co., Inc., a local concern, provided substantial financial backing during the term of the original contract and extensions thereof, but this fact neither adds to nor subtracts from the merits of the present salvage claim.

Following the expiration of the written contract as extended, libellants were advised that no further extension would be granted, but that salvage efforts would be continued on a bid basis with any salvage firm permitted to bid thereon. Libellants, while stating that they were at all times endeavoring to persuade the owner's representatives to grant additional time, frankly concede that no representations, promises, or assurances of any kind were given and that the only answer forthcoming was to the effect that the contract had expired.

The tow lines and cables partly owned or leased by libellants were not removed from the vessel following the expiration of the contract. The evidence is not clear as to the efforts, if any, actually exerted by libellants in an effort to secure their property as described

above. The Master and Chief Officer, being Greek and unable to speak English with any degree of success, afforded difficult means of communication. On Saturday, June 16, 1956, libellants telegraphed the owner's representatives in New York advising that libellants had been denied access to the vessel for the purpose of removing their lines, cables, etc., and suggesting that a charge of $500 per day was being made for the use of this equipment, with libellants reserving its salvage rights if the vessel was freed in the interim. Early Monday morning, June 18, 1956, one Bush, a representative of the owners or operators, telephoned Reasor, the Secretary and Treasurer of E. V. Williams Company, Inc., and reaffirmed the fact that libellants' contract had expired. Thereafter, Bush wired libellants at the office of E. V. Williams Company (which apparently was the local contact point for libellants due to the fact that the vessel was not readily accessible to any nearby telegraph office). The telegram denied that libellants had been refused access to the vessel for the purpose of removing the lines and other equipment, and urged libellants to remove same at once. Bonifay, one of the libellants, admitted that the contents of this telegram were transmitted to him by telephone on the night of June 18, 1956, but the actual telegram was not received until the night of June 19, 1956. In the interim period certain events transpired which, according to libellants, form the basis of their present salvage claim. The Court does not deem it necessary to cite any authority for the proposition that libellants were bound to carry out the advices of the shipowner's representative when the contents of the telegram were communicated to libellant, Bonifay, by telephone.

Tuesday, June 19, 1956, brought with it a northeast storm and its attendant heavy seas and high winds. Without any suggestion of authority or permission, libellant, Bonifay, requested E. V. Williams Company to send two bulldozers to the job—obviously with the thought of freeing the vessel on high tide. At ap-

proximately 5:30 P. M. one bulldozer and operator appeared and, at the direction of Bonifay, hooked up to one of the tow lines. The operator of the bulldozer testified that the machine went forward about four feet before stopping. Thereafter a verbal altercation arose with the Chief Officer, who does not speak English, but it is apparent that the Chief Officer was insisting that the bulldozer operator would have to desist from endeavoring to pull the vessel. The operator further stated that Bonifay insisted he was paying for the bulldozer and the operator was instructed to follow libellant's orders. Shortly thereafter another bulldozer and operator appeared on the scene and the two machines operated in tandem fashion but without success. This is rather significant as libellants urge that the vessel had been floated earlier on the evening of June 19 which, if true, would hardly have required the services of the second bulldozer. It is also pertinent to note that the first bulldozer operator had met with slight success in moving the vessel during the contract period—which he estimated to be two feet—but there is no contention that the vessel was afloat at any time prior to the evening of June 19.

Several witnesses testified that, in their opinions, the Paraporti was afloat on the late evening of June 19. This is understandable as the heavy seas and strong winds would cause such an impression. To state that these impressions made the vessel afloat for salvage purposes would, in the Court's opinion, require conjecture and speculation beyond the realm of reason. For the purpose of ruling on respondent's motion to dismiss it will, however, be assumed that the vessel was then capable of being freed if additional towing equipment had been made available within a reasonable time thereafter.

Just prior to the bulldozer operations, libellants sent an employee aboard the vessel with instructions to tighten the lines and cables. He was asked by the Court what would have been required to release the lines, etc., and he related a comparatively simple procedure. This,

however, was not his purpose in boarding the vessel, despite the fact that his employer had received notice to remove same. It is apparent to the Court that libellants, without any authority and contrary to express directions, were endeavoring to minimize their losses by making a last effort to free the vessel.

An English-speaking representative of the shipowners appeared on the scene in company of the Master. Bonifay was again told that he had no contract and without which Bonifay could perform no services. While Bonifay and other witnesses testified that Bonifay indicated his willingness to sign a contract, the terms of such proposed contract were not discussed and the representative insisted that Bonifay should stop all work at once. The Master was instructed to cut the lines and Bonifay thereupon placed himself under the cable in such a position that he would be injured if the lines were cut. After some few minutes the Master was ordered to cut the lines, which he proceeded to do with a blow torch and, as may be expected, Bonifay removed himself from this position of danger.

Libellants urge that the cutting of the lines caused the vessel to lose its favorable position for salvage purposes. It is contended that, if the lines had been permitted to remain in position, the vessel then being on a seventy degree angle could readily have been towed to the channel on any subsequent day. Bonifay testified that the services of a tug could have been procured but the evidence reveals that the Coast Guard, by reason of policy, would not assist in such a project, and that a period of three days or longer would have been required to lease a Navy tug. The requirements, financial and otherwise, to lease a Navy or private tug were beyond the ability of libellants to comply without financial assistance from E. V. Williams Company. Whether this concern would have continued to give financial support to this endeavor under this state of facts is not revealed by the evidence. Furthermore, to handle the vessel—as distinguished from towing same—would require at least two tugs.

The evidence falls far short of indicating libellants' ability to salvage the Paraporti even assuming the correctness of the impressions as related by the witnesses who indicated that the vessel was afloat on the evening of June 19. On the contrary, the evidence clearly reveals that libellants were operating on the proverbial "shoe string" and that, aside from the financial assistance rendered by E. V. Williams Company, the libellants were without the necessary funds to continue operations.

■ During the course of trial the Court denied libellants' request for a mandatory injunction to require the Marshal of this Court to enter into a contract with libellants on a "no-cure, no-pay" basis. It is fundamental that an admiralty court has no authority or jurisdiction to grant an injunction in a case such as this. Benedict on Admiralty, 6th Ed., pp. 148, 149, § 71, and cases cited therein. For like reasons, a request for an injunction to prohibit the Master and crew from interfering with the lines, cables, etc., was denied and, in addition, a portion of several of the cables and lines constituted a part of the vessel's equipment.

■ As to the merits of the salvage claim, is is abundantly clear from the testimony of the libellants that they were mere gratuitous intermeddlers. It is well settled that a voluntary salvor, acting without consent (express or implied) or permission of the vessel's owner, and contrary to the owner's instructions, is not entitled to compensation of any sort. Cuttyhunk Boat Lines v. The Pendleton, D.C., 119 F.Supp. 608, 1954 A.M.C. 123; F. E. Grauwiller Transportation Co., Inc., as owner of Scow Jeanne v. King and Elliott, D.C., 131 F.Supp. 630, 1955 A.M.C. 1236. This is not a case in which the services of the alleged salvor have been rendered in an emergency, or have been partially accepted and then rejected, such as was the factual situation presented in The Manchester Brigade, D.C., 276 F. 410.

■ The motion of respondents to dismiss the libel filed herein is sustained and a decree will be prepared by proctors for respondents and, after presentation to proctors for libellants for inspection, delivered to the Court for entry. The decree should expressly provide that the Court is not determining the rights, if any, of libellants to recover the fair rental value for the use of libellants' equipment subsequent to June 14, 1956.